# REPORTS.

## GRAY *v.* JACKSON & Co.

The defendants, who were common carriers between P. and B., carried from P. to B. a parcel directed to R., a place beyond their route, and delivered it to the next carrier according to the usage of the business, and the parcel was lost beyond B. The judge who tried the facts did not find an undertaking of the defendants for carriage beyond B., and thereupon gave a general verdict for the defendants. *Held*, that there was no ground for setting aside the verdict.

When a contract is made by a common carrier in one State to transport goods from that State into another, and the goods are lost, the rights of the parties are governed by the law of the State in which the loss happens.

ASSUMPSIT, by Calvin Gray against the defendants as common carriers. It was alleged in the declaration that the defendants received of the plaintiff, at Portsmouth, N. H., the sum of $41,·to be carried from Portsmouth to Reading, Mass., and there delivered to Nancy Thrasher. By agreement of parties the case was tried by the court, who found the following facts.

The defendants are expressmen running from Portsmouth to Boston. They receive, at Portsmouth, besides packages for Boston, packages for all parts of the country, and at the end of their route deliver them to other expressmen to be forwarded. There is no evidence that the defendants have any business connection or arrangement with other expressmen. July 11th, 1865, the plaintiff delivered to the defendants, at Portsmouth, a package containing $41, directed to " Miss Nancy Thrasher, Reading, Mass.," a place not upon the defendants' route ; and the plaintiff paid the defendants fifty cents as the entire expressage from Portsmouth to Reading. The defendants gave the plaintiff the following writing :

" Jackson & Co. Portsmouth and Boston Express. Portsmouth,. July 11th, 1865. $41.00. Received of Calvin Gray, package said to·

contain forty-one dollars, directed to Miss Nancy Thrasher, Reading, Mass., per Jackson & Co. Marden." The plaintiff knew that the defendants carried packages from Portsmouth to Boston, but did not know whether their line extended elsewhere or not. No notice was given him on this point by the defendants, except so far as such notice may have been given by the above writing and the other facts herein mentioned. When the package was delivei d by the plaintiff to the defendants, the plaintiff understood that the defendants undertook to carry it to Reading and there deliver it to Miss Thrasher. The defendants understood that they undertook to do nothing more than they afterwards did. There was no conversation on this matter at the time, but the court finds the understanding of each party to have been as above stated.

The defendants carried the package to Boston, gave it to the agent of the expressman whose route was from Boston to Reading, paid him twenty-five cents, and took his receipt. The Reading expressman appropriated the money to his own use, and has since left this part of the country.

The defendants had no business connection with the express from Boston to Reading.

About four weeks after July 11th, an agent of Miss Thrasher, to whom the Reading expressman had admitted the receipt of the money but refused to pay it over (virtually acknowledging that he had spent it), went with Miss Thrasher to the Boston office of the defendants, notified the defendants of the non-receipt, and demanded the money. About two weeks later, the plaintiff notified the defendants, at their Portsmouth office, that the money had not been received.

The court found a verdict for the defendants, and the plaintiff moved for a new trial.

*Minot, Tappan & Mugridge,* for the plaintiff.

*C. P. Sanborn,* for the defendants.

Doe, J. "Whenever any subject takes upon himself a public trust for the benefit of the rest of his fellow-subjects, he is *eo ipso* bound to serve the subject in all the things that are within the reach and comprehension of such an office, under pain of an action against him," says Holt, C. J., in *Lane* v. *Cotton,* 12 Mod. 472, 484, where he names innkeepers and common carriers as engaged in public official duties. One who, in the language of Lord Holt, "has made profession of a public employment," or "exercises a public employment" (*Coggs* v. *Bernard,* 2 Ld. Raym. 917), is bound to serve the public while he remains, or professes to remain, in that employment. The obligation of a common carrier of goods is "to receive and carry goods according to his public profession." *Johnson* v. *M. R. Co.,* 4 Exch. 367, 373.

The defendants have taken upon themselves the public office, trust, and duty of common carriers between Portsmouth and Boston, but not between Boston and Reading. They were under an obligation as com-

mon carriers to receive the plaintiff's parcel and carry it to Boston.
That was their official duty. Assuming the office, they promise to per-
form its duties. This is common law. But it was no part of their
official duty to carry the parcel to Reading, or to receive it coupled
with a contract to carry it to Reading. And when the plaintiff accuses
them of violating a contract to carry it to Reading, the plaintiff must
prove the contract on which he relies. It is not proved by the official
duty of their public employment, because that does not extend beyond
Boston. A contract to carry the parcel to Reading must be a mutual
understanding of the parties. It may be proved expressly or by impli-
cation, by direct or circumstantial evidence, by writing or parol, by
words or conduct or usage. The understanding may be mutual, in
contemplation of law, if the defendants are estopped to deny that it is
mutual.

In *Hyde & a.* v. *T. N. Co.*, 5 T. R. 389 (decided in 1793), the de-
fendants, a navigation company, carried cotton to Manchester, where
it was put in a warehouse and burned the same night. In the bill, made
out by the defendants and paid by the plaintiffs when the cotton was
received by the defendants, was a charge for cartage, which was intend-
ed for the cartage to the defendants' warehouse in Manchester. For-
merly the defendants employed their own carts, but had latterly given
up this business, together with the profits derived from it, to their book-
keeper ; and the plaintiffs knew that the cartage was received for him.
A verdict was found for the plaintiffs, and the defendants moved to set
it aside. The only ground upon which the motion could be granted
was, that there was no evidence to sustain the verdict. The only ques-
tion for the court was, whether there was any evidence from which the
jury could have found the fact that the defendants undertook as com-
mon carriers to cart the cotton to the plaintiffs' warehouse ; and the de-
cision was in favor of the plaintiffs. Mr. Justice BULLER said, " It is like
the case of an innkeeper, who agrees with his head ostler that the latter
shall supply the customers with post horses ; in which case, if goods be
lost, the innkeeper is liable because he holds himself out to the public
as the responsible person." All the judges held that the charge for
cartage showed that the defendants undertook to deliver the cotton at
the plaintiffs' warehouse. Whether such an undertaking was shown by
such a charge under the circumstances, was a question of fact which
the jury had decided ; and the court could decide nothing more than
this,—that the charge was evidence from which the jury might properly
have found the undertaking. But the court, in accordance with the
English custom of the judge giving his opinion on the weight of the
evidence, spoke of the evidence, not as tending to prove or competent
to prove the fact, but as proving it.

Judge REDFIELD says, that in England, until a late period, the usage
of inland common carriers was to employ their own porters to deliver
parcels ; that those who dealt with them acted upon the faith of their
making a personal delivery ; and that " *Hyde* v. *Tr. and M. Nav. Co.*, 5
T. R. 387, is decided upon this ground, and upon the additional fact
that the carriers charged for cartage to the house of the consignee, thus

showing that they so understood the contract." *F. & M. Bank* v. *C. T. Co.*, 23 Vt. 208, 209. In that view of the subject there are no legal elements except the common doctrine of estoppel and the general principle that a mutual understanding may be a contract. If the carrier and the consignor understand that the carrier undertakes to deliver a parcel at the town to which it is directed, or to the person to whom it is directed, or at his house or shop, the mutual understanding is the contract. The usage of making such delivery may be evidence tending to show the fact of an understanding that a particular parcel is to be delivered according to the usage. If the consignor had and the carrier had not such an understanding, the carrier's usage may be evidence tending to show the fact that he held himself out and practically represented himself as undertaking to do what he usually did; and if the consignor acted on the faith of such holding out and practical representation, the doctrine of estoppel may be applied. The carrier may be estopped to deny that he understood the contract to be what his conduct induced the consignor to understand it to be. And the usage of other carriers may tend to show the fact that the defendant, by carrying on their kind of business, held himself out as undertaking to carry goods according to the usage of his neighborhood; and an estoppel may be raised in that way.

In this view there is no law peculiar to this branch of the contract of a common carrier. There is no law in it, except the elementary and general principles applicable to all contracts, that a contract is a mutual understanding, and that a party may be estopped to deny that his understanding was such as he induced the other party to believe it to be. All the rest of the question whether by an implied contract a carrier undertook to carry goods beyond his route, is a question of fact to be determined upon the evidence by the tribunal authorized to try the questions of fact involved in the issue.

How can so plain a question of fact be changed into a question of law? In *Muschamp* v. *L. & P. J. R. Co.*, 8 M. & W. 421 (decided in 1841, and everywhere accepted as the leading case on this subject), it was held to be a question of fact. A parcel directed to a place beyond the defendants' route, and carried by them through their route and forwarded, was afterwards lost. Baron ROLFE " stated to the jury, in summing up, that where a common carrier takes into his care a parcel directed to a particular place, and does not by positive agreement limit his responsibility to a part only of the distance, that is *prima facie* evidence of an undertaking on his part to carry the parcel to the place to which it is directed: and that the same rule applied, although that place were beyond the limits within which he in general professed to carry on his trade of a carrier." The jury found a verdict for the plaintiff, and the defendants moved " for a new trial, on the ground of misdirection."

" Lord ABINGER, C. B.—The simple question in this case is, whether the learned judge misdirected the jury in telling them that if the case were stripped of all other circumstances beyond the mere fact of knowledge by the party that the defendants were carriers only from Lancas-

ter to Preston, and if, under such circumstances, they accepted a par-
cel to be carried on to a more distant place, they were liable for the
loss of it, this being evidence whence the jury might infer that they
undertook to carry it in safety to that place.   I think that in this prop-
osition there was no misdirection.   It is admitted by the defendants'
counsel, that the defendants contract to do something more with the
parcel than merely to carry it to Preston: they say the engagement is
to carry to Preston, and there to deliver it to an agent [of the plaintiff]
who is to carry it further, who is afterwards to be replaced by another,
and so on until the end of the journey. * * * But if, as it is admitted
on both sides, it is clear that something more was meant to be done by
the defendants than carrying as far as Preston, is it not for the jury to
say what is the contract, and *how much* more was undertaken to be done
by them ?   Now, it certainly might be true that the contract between
these parties was such as that suggested by the counsel for the defend-
ants; but other views of the case may be suggested quite as probable.
* * * Is it not then a question for the jury to say what the nature of
this contract was; and is it not as reasonable an inference for them to
draw, that the whole was one contract, as the contrary ? * * * Suppose
the owner of goods sent under such circumstances, when he finds they
do not come to hand, comes to the railway office and makes a complaint,
then, if the defendants' argument in this case be well founded, if the
railway company refuse to supply him with the name of the new agent,
they break their contract.   It is true that, practically, it might make no
great difference to the proprietor of the goods which was the real con-
tract, if their not immediately furnishing him with the name would
entitle him to bring an action against *them*.   But the question is, Why
should the jury infer one of these contracts rather than the other ?
Which of the two is the most natural, the most usual, the most prob-
able ? * * * The whole matter is therefore a question for the jury, to
determine what the contract was on the evidence before them. * * *

"Gurney, B.—I think there was no misdirection in this case, and that
the jury might fairly infer the contract was such as was stated by the
learned judge."

In this explicit manner the undertaking of the carrier to be respon-
sible for the delivery of the parcel beyond his own route was held to
be a pure question of fact, to be determined by the jury on the evidence.
There was such an undertaking, if both parties so understood it.
Whether there was such an understanding, was plainly a question
of fact, and no attempt was made to change it into a question
of law.   It was submitted to the jury by Baron Rolfe, and the only
point decided by the court was, that it was a question of fact which
must be submitted to the jury.

When Baron Rolfe told the jury that the evidence in the case was
*prima facie* evidence of such an undertaking, by these words he held
the undertaking to be a matter of fact to be proved by evidence.   In
saying that the evidence was *prima facie* evidence of the fact, he merely
expressed his opinion of the weight of the evidence, in accordance with
the general custom of English judges.   *State* v. *Hodge*, 50 N. H. 519,

522, 525. In their practice, such opinions are given in various forms. Where we should say, "There is some evidence to be submitted to the jury," English judges often say, "The evidence proves," or "The weight of the evidence is," or "From the evidence the inference is," or "The presumption is," or "This is *prima facie* evidence," or "This evidence shifts the burden of proof," or "This evidence is sufficient to prove the fact unless it is rebutted by the other party." And when exception is taken to such statements, the point intended to be raised by counsel and decided by the court is, not whether the judge may rightfully give the jury his opinion of the evidence in such forms (that is taken for granted), but whether there is any evidence for him to give his opinion of, and for the jury to give their verdict upon. *Muschamp* v. *L. & P. J. R. Co.* is an instance of this practice. The defendants contended that the evidence did not tend to prove an undertaking of the defendants to carry the parcel beyond their own route, but that it tended to prove a different undertaking, and that there was misdirection in submitting the question to the jury instead of directing a verdict for the defendants, or ordering a nonsuit. If the defendants had admitted that there was evidence from which the jury might find an undertaking of the defendants to carry the parcel beyond their own route, and had contended that there was misdirection in the judge giving the jury his opinion of the *prima facie* weight of the evidence, their first difficulty would have been to convince the court that they were serious in raising an objection so apparently preposterous in Westminster Hall.

The opinions of English judges on the weight of the evidence being constantly given in such expressions as "From this evidence the inference [or presumption] is," or "This is *prima facie* evidence," or other equivalent phrases, these expressions, having been used for ages in the trial of cases by jury, became the common judicial language used in delivering judgment on motions for new trials as well as in summing up to the jury. On the motion for a new trial, in *Muschamp* v. *L. & P. J. R. Co.*, Lord ABINGER, delivering judgment, said the undertaking alleged by the plaintiff "is the most likely contract under the circumstances." In saying this he no more undertook to state a rule of law than Mr. Justice BAYLEY did when he told the jury, in *King* v. *Diggles* (50 N. H. 520), that "it was not very likely" that an old man would sell his spectacles. Lord ABINGER also incidentally remarked, "In cases like the present, particular circumstances might no doubt be adduced to rebut the inference which, *prima facie*, must be made, of the defendants having undertaken to carry the goods the whole way." Giving his opinion of the weight of the evidence, he declared the undertaking alleged by the plaintiff to be "the most likely contract under the circumstances," and he drew the inference of fact that "the most likely contract" was, *prima facie*, the contract which the parties intended to make, and by a mutual understanding did make. All this he expressly held to be matter of fact and not matter of law. "The whole matter," says he, "is therefore a question for the jury, to determine what the contract was on the evidence before them."

But the decision in that case has often been misunderstood. It has

been erroneously supposed that the opinions of ROLFE and ABINGER, on the *prima facie* weight of the evidence, were laid down as law. Through that error, the decision has been taken as the establishment of a peculiar legal principle fixing the liability of common carriers beyond their own routes, although it was held, with remarkable clearness and emphasis, that the whole matter was a question of fact for the jury. By such a mistake, and others of a similar kind, a plain question of fact may inadvertently be changed into a question of law.

The mistake in regard to the doctrine of Muschamp's case, on the point of *prima facie* evidence, was promoted, and another mistake was disseminated, by the reporters who made the head note of the case, by adding to a summary of the evidence this unfortunate statement: "*Held*, that the Lancaster and Preston Railway Company were liable for the loss." If they had said, " *Held*, by the jury, that the company were liable. *Held*, by the court, that there was evidence competent to be submitted to the jury," they would have made a correct and useful statement of the case. In Angell on Carriers, sec. 95, it is said that in Muschamp's case " it was held that the company were liable for the loss," from which the reader would understand that it was so held by the court.

It has been by no means an unusual thing for fact to be turned into law by the English practice of the judge giving the jury his opinion of the evidence.· *State* v. *Pike*, 49 N. H. 438; *Lisbon* v. *Lyman*, 49 N. H. 572; *State* v. *Hodge*, 50 N. H. 521. If the decision in Muschamp's case had always been carefully read with a full comprehension of that practice, and a clear perception of the distinction between law and fact which that practice tends to confound, the liability of carriers beyond their own routes would have avoided all the darkness, confusion, and conflict in which it has been involved. The simple solution of all the difficulties that have arisen on this subject is, not to hold fact to be law, and not to mistake the opinions of judges on the weight of evidence for opinions on principles of law.

The perplexity of some American authorities, growing out of a misapprehension of Muschamp's case, makes it necessary, in examining all the authorities, English and American, to observe critically how the question arose in each particular case,—whether it was submitted to the jury or any other tribunal as a question of fact, whether the real doctrine of Muschamp's case was understood, whether the attention of the court was called to the distinction between law and fact, and whether a single case can be found in which the court, having their attention expressly and directly called to the distinction, or having the distinction clearly in mind, have held so plain a question of fact to be a question of law.

In *Watson* v. *A. N. & B. R. Co.*, 15 Jur. 448, S. C. 3 Eng. L. & Eq. 497 (decided in 1851), the defendants, by their station-master Chevins, received goods directed to Cardiff, a place beyond their line, which extended only as far as Nottingham. The plaintiff claimed damages for detention of the goods at Bristol, a place beyond the defendants' line, and delay in their arrival at Cardiff. The case was tried by

the judge of the county court (without a jury), who awarded damages to the plaintiff. " The company now appealed against the decision, on two grounds: first, that they were not liable for the carriage beyond Nottingham." Opinions were delivered by Justices Patteson and Erle. The judge of the county court had found upon the evidence an undertaking of the defendants to carry the goods beyond their line, and there is nothing to show that he did not find the undertaking as a fact. Patteson, J., commenced his opinion by saying, " We must take this case as it is stated, although we do not quite see what question is submitted to us." The question of the defendants' undertaking for carriage beyond their line being a question of fact, as held in Muschamp's case, and the judge of the county court having decided that question as he had authority to do, and incompetency of evidence not being stated as a ground of appeal, it is not singular that the court were not quite able to see what question of law was submitted to them. Mr. Justice Patteson further said, " If carriers receive a package to carry to a particular place, whether they themselves carry it all the way or not, they must be said to have the conveying of it to the end of the journey." That is a proposition about which there never was any doubt. Receiving " a package to carry to a particular place," means receiving it with an undertaking to carry it to that place ; and a carrier, like other contractors, is bound to perform his undertaking. The judge of the county court, occupying the place of a jury, had found the undertaking, and on appeal the question was, whether there was any evidence tending to prove the undertaking. On which question Mr. Justice Patteson said, " Chevins appears to have been the agent of the defendants; he receives the parcel to carry it to Cardiff, and makes out an invoice which the defendants have refused to produce. Now, putting these circumstances together, there is abundant evidence that they contracted to carry the package to Cardiff." Mr. Justice Erle said, "The first question is, whether there is any evidence of the defendants' having contracted," and he expressed his opinion of the weight of the evidence in the usual English manner. This case is a mere confirmation of the doctrine of Muschamp's case, that the question of a carrier's undertaking to carry beyond his route is a question of fact, and the question whether there is any evidence tending to show such an undertaking is a question of law.

In consequence of carriers being liable to be held by juries on circumstantial evidence to have undertaken to carry beyond their own routes as in Muschamp's case, and apparently in consequence of the attention of carriers being called by that case to this liability, some of them took the precaution to insert in their way-bills, bills of lading, or receipt-notes, notices, conditions, or stipulations intended to protect them against such liability. And in *Fowles* v. *G. W. R. Co.*, 7 Exch. 699 (decided in 1852), it was held, upon a receipt-note signed by the plaintiff's agent and construed by the court as a written contract, that the defendants had not undertaken to carry beyond their route.

In *Scothorn* v. *S. S. R. Co.*, 8 Exch. 341 (decided in 1853), the defendants received, at the G. B. Station, packages directed to the E. I.

Docks, London, and received the freight for the entire distance. By their practice, all goods received by them at the G. B. Station and directed to London were carried on their own line as far as Birmingham, and from thence forwarded to London by the L. & N. W. R. Co. The jury found that a clerk of the latter company had authority from the defendants to receive a countermand, which the plaintiff gave him, changing the direction of the packages to another point in London. The defendants' counsel seem to have been so well assured that the jury would find an undertaking to carry beyond their route, as the jury found in Muschamp's case, that they did not make any question on that point, but merely claimed that the clerk was not the defendants' agent to receive the countermand. ALDERSON, B., said, " There can be no doubt that the defendants made a contract to carry the plaintiff's goods the whole distance to London for certain reward for the entire journey ; and there is also no doubt that they would have been liable for loss through their negligence in carrying during any part of that journey. Then the question arises, What was the contract between the parties ? It really amounts to no more than a question of fact; and there is abundant evidence of a contract to deliver, as stated in the declaration, according to the plaintiff's directions, in London."  In saying " There can be no doubt that the defendants made a contract to carry the plaintiff's goods the whole distance to London," he expressed a very strong opinion on the weight of the circumstantial evidence on a question which the defendants did not raise.  They did not raise it, probably because they knew what the verdict would be upon it even if the jury were not aided by the opinion of the court on the weight of the evidence, and because they knew what the opinion of the court was on the weight of the evidence in such cases, and because they knew that that opinion would be given to the jury if they raised the question.  It was manifestly useless for the defendants to raise the question, when the inclination of the jury against them would be so strongly reinforced by the opinion of the court on the weight of the evidence.

There is certainly nothing in this case in conflict with Muschamp's case ; but the latter is confirmed by the question and answer of Baron ALDERSON, " What was the contract between the parties ? It really amounts to no more than a question of fact."

In *Collins* v. *Bristol and Exeter Railway Co.*, 11 Exch. 790 (decided in Feb., 1856), the Great Western Railway Co., who were carriers from Bath to Bristol, received from the plaintiff a van-load of furniture to be conveyed to Torquay, a place beyond their line ; and the plaintiff signed a receipt-note which contained a stipulation that the Great Western Railway Co. were not to be responsible for loss or damage arising from fire, and a stipulation that they were not to be responsible for any loss, damage, or detention that might happen beyond the limits of their railway.  The furniture was burned in the possession of the defendants, who were the next carriers beyond the Great Western Co. on the line toward Torquay.  It was agreed at the trial that no advantage should be taken as to the action not having been brought against the proper carrier.  The question was, whether any of the carriers on the entire

line were responsible for the loss. The jury found there was no negligence on the part of the defendants, and the judge directed a verdict for the plaintiff. It was held by the Court of Exchequer (ALDERSON, B., delivering the opinion), that the contract for transportation from Bath to Torquay was one contract made by the plaintiff with the Great Western Co. alone; that the company contracted in express terms upon the face of he receipt-note to carry the goods from Bath to Torquay; that the stipulation as to fire protected them against loss from fire during the entire journey; that no action was maintainable against any of the companies; and that there should be a nonsuit. All this was a mere construction of the receipt-note held to be a written contract; and the decision is not authority on the question whether the finding, by inference and implication from circumstantial evidence, of an undertaking of a carrier to carry beyond his own route is a matter of law or a matter of fact.

In Nov., 1856, Collins's case was again decided, on appeal in the Exchequer Chamber. 1 H. & N. 517. It was there held that the true construction of the writing signed by the plaintiff was, that the Great Western Co. did not undertake to carry the goods to Torquay; that they were not to be responsible beyond their own railway; and that the stipulation as to loss by fire protected them alone—and the judgment of the Court of Exchequer was reversed. This decision, like the one reversed by it, being a mere construction given by the court to a paper held to be an express written contract, is not authority on the question whether the finding an undertaking by inference and implication from circumstantial evidence is a matter of law or a matter of fact.

In 1859, Collins's case went to the House of Lords on appeal. The judges were summoned, and asked whether the defendants were liable. BYLES, CROMPTON, and WIGHTMAN answered in the affirmative, WATSON and MARTIN in the negative, and WILLIAMS replied that there was evidence to go to the jury on the question. BYLES, J., said, "There was but one signed document between the plaintiff below, the consignor, and the Great Western Railway Company—but that comprehends two contracts." WATSON, B., said, "I think there never was any contract with the defendants, but only one with the Great Western Railway Company. All this turns on the receipt-note, and the 10th condition endorsed thereon. * * * In the first case on this subject, *Muschamp* v. *The Lancaster Railway Company*, ROLFE, B., left it to the jury, as a matter of fact, whether, where goods were carried over continuous lines of railway belonging to several companies, there was a separate contract with each company, or one contract with the company of the first railway who received the goods; and it was found by the jury, and upheld by the court, to be one contract with the company who received the goods." CROMPTON, J., said, "This case appears to me to depend on the construction which is to be put upon the contract of carriage signed by the plaintiff below when he delivered the goods in question to the Great Western Railway Company. * * * The carrier in these cases is not bound to undertake to carry goods beyond his own line of railway: it must depend entirely on the contract whether he under-

takes any duty after the goods have arrived at the place beyond which he does not carry. The contract is this case appears to me to be of this kind : the Great Western Railway Company being under no obligation in point of law to receive goods to be carried beyond their own line, say to the plaintiff,—we will carry on the terms set forth in the receipt-note ; and to these the plaintiff agrees." MARTIN, B., said, "The question mainly, although not entirely, depends upon the receipt-note ; and in my opinion that note, with the facts, proves, not the contract which the plaintiff is bound to establish, but a very different one, viz., a contract by the Great Western Railway Company to carry the goods from Bath to Torquay. * * * I give my opinion on the question proposed by your Lordships—not on the question whether, on the evidence at the trial, there was a case to go to the jury." WILLIAMS, J., said, " I understand the question proposed by your Lordships to be, in effect, whether there was any evidence to go to the jury that the defendants were liable. * * * To the question so understood, I reply in the affirmative."

The case was decided by Lords CHELMSFORD, CRANWORTH, WENSLEYDALE, and KINGSDOWN. CHELMSFORD, Lord Chancellor, said, " If the true meaning of the 10th condition be what I have stated, then there is an express contract with the Great Western Railway Company for the conveyance of the goods from Bath to Torquay. * * * I think, therefore, that the contract was entire, was for the whole journey from Bath to Torquay, and was made with the Great Western Railway Company alone. * * * I may add, that my Lord BROUGHAM, who heard the whole of the argument, entirely agrees in this opinion." Lord CRANWORTH said, " The clear import of the receipt-note, taken by itself, is, that the company received the goods of Collins under an engagement to convey them to Torquay." Lord WENSLEYDALE said, " The contract on which this case depends is so ill penned that it is not surprising those who have to construe it should form different opinions upon its meaning. * * * On the whole, although I have felt considerable doubt in the course of the proceedings, I think the minority of the judges, who have given their opinions to your Lordships, are right." Lord KINGSDOWN said, " If the question was, as one or two of the judges in their opinions seem to consider, whether, the case having been properly left to the jury, there was evidence on which the jurors might find the verdict complained of, I should have had great difficulty in saying there was not. But the case depends on the construction to be put on a written contract ; and as to that, although not without some hesitation, I acquiesce in the view taken of it by my noble and learned friends." And the judgment of the Court of Exchequer Chamber was reversed. This decision, like the former ones in the same case, is a mere construction of a paper held to be an express contract in writing ; but there is much in the opinions of the judges and lords to show that the question whether the finding an undertaking by inference and implication from circumstantial evidence was regarded as a question of fact to be decided by the jury.

In *Wilby* v. *W. C. R. Co.*, 2 H. & N. 703 (decided in 1858), the

defendants, whose railway extended from Penzance to Truro, received at Penzance goods addressed to a person at Wolverhampton "per first steamer from Hayle." The defendants safely carried the goods to Hayle, and delivered them to a steamer. The goods were damaged while in the possession of some carrier beyond the defendants' route. The case was submitted to the court upon an agreed statement of facts, the court "to be at liberty to draw any inference of fact which a jury might properly draw." "POLLOCK, C. B. The court being at liberty to draw the same inferences as a jury, we entertain no doubt as to what conclusion we ought to draw; though I should have been better satisfied if it had fallen to the province of a jury. However, we must decide a question of fact, viz., whether there was evidence for a jury that the defendants undertook to carry the parcel the whole distance from Penzance to Wolverhampton, or whether they only undertook to carry it from Penzance to Hayle, and there place it on board a steam-packet, when their responsibility would end. * * * In this case, if I had been on the jury I should have had no hesitation in finding that the defendants undertook to carry the parcel from Penzance to Wolverhampton. WATSON, B.—I am of the same opinion. This is rather a question of fact than of law, and as to the fact I entertain no doubt. * * * In *Muschamp* v. *The Lancaster and Preston Railway Company*, 8 M. & W. 421, the question was properly left to the jury. * * * * * It is conceded that *Muschamp* v. *The Lancaster and Preston Railway Company* was well decided; but it is said that this case is distinguishable, because for a certain distance the sea intervenes. * * * There is nothing unreasonable, so as to lead to the conclusion that the company did not contract to carry by sea." CHANNELL, B., said, "I should have been more satisfied if the question had been submitted to a jury; but, since we have to decide it, I think that the defendants undertook to carry the whole distance. With respect to the argument that there was a special direction that the parcel should be sent by steamer from Hayle, that circumstance does not, in my opinion, alter the case. The question still is, whether the defendants' liability was that of common carriers. If they did not like to carry by steamer as directed, they were at liberty to reject the parcel; but they did not do so. As to the objection that the carriage by sea was *ultra vires*, I do not at present see any distinction between carrying by sea and carrying on the line of another person." And judgment was given for the plaintiff.

In *Mytton* v. *Midland Railway Company*, 4 H. & N. 615 (decided in 1859), the South Wales Railway Co. were carriers from Newport to a point from which the Great Western Railway Co. were carriers to Gloucester, and the defendants were carriers from Gloucester to Birmingham. The plaintiff bought of the South Wales Co. at Newport a through ticket for Birmingham, and was carried over the three lines, but his baggage was lost by the defendants. By agreement of parties a verdict was entered for the plaintiff for £56, subject to a case in which the evidence was stated. MARTIN, B., delivering the opinion of the court, said, "Upon these facts the only question is, whether there was any contract between the plaintiff and the Midland Railway Com-

pany, or whether the contract was not an entire contract with the South Wales Railway Company to convey the plaintiff the whole distance from Newport to Birmingham.   We are of opinion that there was but one contract, and that that contract was with the South Wales Railway Company, and not with the Midland Railway Company.   There was one sum paid and one ticket given for the entire journey, and there was no evidence whatever of any privity of the Midland Railway Company to that contract, except that, by arrangement with the South Wales Railway Company, they conveyed on their line passengers booked from Newport to Birmingham.   We think that the principle of *Muschamp* v. *The Preston and Lancaster Railway Company* applies to this case ; and, as there was no contract with the Midland Railway Company, the plaintiff fails in this action, and the defendants are entitled to our judgment."   And judgment was rendered for the defendants.   The parties having referred the evidence to the court, the court found, upon the evidence, that the first carrier undertook to carry the plaintiff to Birmingham.   The court declared that they followed Muschamp's case, in which the question was held to be and decided as a question of fact.   About the same time, WATSON, B., one of the judges who decided this case, giving his opinion in Collins's case to the House of Lords, particularly referred to Muschamp's case, and to the question being there left " to the jury as a matter of fact." And the year before the decision of Mytton's case, three of the judges who decided it,—POLLOCK, WATSON, and CHANNELL,—delivering their opinions in Wilby's case, had asserted the question to be one of fact, and had decided it as such, no member of the court expressing any dissent or doubt.   If the court had intended in Mytton's case to overturn their own decision made the year before in Wilby's case,—if they had intended to hold that to be law in 1859, which they had unanimously and explicitly held to be fact in 1858,—they would have avowed such a design, or have manifested it in an unmistakable manner.   Mytton's case, therefore, must be classed with the cases in which the question of a carrier's undertaking to carry beyond his own route has been decided as a question of fact.

In *Coxon* v. *Great Western Railway Co.*, 5 H. & N. 274 (decided in 1860), the court held that, by a document construed by the court as a written contract, the first carrier undertook to carry beyond his own route.

*Great Western R. Co.* v. *Blake*, 7 H. & N. 987 (1862), was tried before MARTIN, B., in 1860, when the following facts appeared.   The defendants (the Great Western R. Co.) contracted with passengers to carry them from Paddington to Milford, over their own railway from Paddington to Grange Court, and thence over the railway of the South Wales R. Co. to Milford.   There was an arrangement between the two companies under which the two lines were worked, and the fares paid by passengers apportioned, between them.   The plaintiff (Blake) purchased the usual ticket from the defendants, and paid his fare, and became a passenger to be conveyed by the defendants from Paddington to Milford.   Without any change of cars, he was injured on the South

Wales line by a collision with an engine left on that line by the servants of the South Wales Railway Company. There was no negligence on the part of the driver of the train in which the plaintiff was carried. " The learned judge told the jury that the circumstance that the engine was left upon the line by the servants of the South Wales Railway Company, and not by the servants of the defendants, did not relieve the defendants from their legal liability, but that they were by law responsible for such negligent and improper act : whereupon the jury found a verdict for the plaintiff." The defendants, in pleading, denied that the plaintiff was " a passenger to be by the defendants safely or securely carried or conveyed on the said journey in the declaration mentioned." But they did not deny that they contracted to carry the plaintiff over the South Wales line to Milford. They probably knew that the jury, aided by the opinion of the court on the weight of the evidence, would find they did so contract. But they claimed that they were not responsible for the acts of the servants of the South Wales R. Co., over whom they had no control. The Court of Exchequer Chamber held that, having contracted to carry the plaintiff to Milford over the line of another company, their responsibility was the same as if they had contracted to carry him all the way on a line of their own.

In *Webber* v. *Great Western R. Co.*, 3 H. & C. \*771 (1865), BLACKBURN, J., left to the jury the question whether the defendants contracted with the plaintiff to convey his goods beyond their line, and the jury found for the plaintiff. During the argument of the defendants' motion for a new trial in the Court of Exchequer, BRAMWELL, B., said, " The question is, whether there was evidence for the jury of a contract with the Great Western Railway Company to carry the whole distance from Worcester to Chester." POLLOCK, C. B., delivering the opinion of the court, said, " I am of opinion with the rest of the court, that there was evidence for the jury of one contract only, and not two contracts. The jury have so found, and we think there was evidence to warrant their finding."

These are the principal English cases usually cited on the question of a carrier's liability beyond his own route. They show that, in England, when there is no paper to be construed by the court as a contract in writing,—when the undertaking of the carrier to carry beyond his own route is to be inferred or implied from circumstantial evidence,—the question is one of fact. They also show that, upon the evidence usually introduced on that question of fact, the jury and the court habitually arrive at the same conclusion. When a carrier has made no stipulation and given no notice that he would not carry or be responsible beyond his own route, he is found, as a matter of fact, to have undertaken to carry to their destination goods directed to a place beyond his own route. Under peculiar circumstances, or in cases of directions to remote, unfrequented, unexplored, or inaccessible regions, a different undertaking would probably be found, and additional precedents made, demonstrating still more clearly the nature of the question as one of fact. But, in ordinary cases, the first carrier's undertaking

being uniformly found to extend to the point of destination on any continuous line of transportation, his liability is practically the same as if it were fixed by a rule of law. And with a tendency to allow settled fact to grow into law, and in the absence of a universal habit of critically and inflexibly preserving the distinction between law and fact, it is not unlikely that the finding of the jury, recorded as the head note in Muschamp's case, will eventually be regarded as the statement of a principle of English law.

In *Keys* v. *Railways & a.*, 8 Irish Com. L. 167 (1858), it was held that there was evidence competent to be submitted to the jury on the question whether carriers, severally owning distinct parts of a line, contracted jointly to carry the plaintiff and his luggage over the entire line. MONAHAN, C. J., delivering the opinion, said that Muschamp's case " decided this proposition,—that where one railway company sells a through ticket, and takes a parcel directed to a person far beyond the limits of its own line, the jury *may* find the existence of a contract by them to carry beyond their own line." ° After commenting on Scothorn's case, the same judge says of Wilby's case and other cases, " It is to be observed that, in this and other cases, no judge has decided the question of liability at all. They only decided that in each of those cases there was evidence to go to the jury of a contract for the entire journey by the company who sold the ticket; and that the jury and not the court were to say whether such contract was in fact entered into."

That case was confirmed in *Hayes* v. *S. W. R. Co.*, 9 Irish Com. L. 474 (1859), where it was also held that by the true construction of a certain written contract between two carriers, one of them was the agent of the other.

These authorities show that the English cases are rightly understood in Ireland.

In *Perkins* v. *P. S. & P. R. Co.*, 47 Me. 573 (decided in 1859), the defendants admitted themselves to be carriers from Portland to Boston. Their station agent at Biddeford signed a written contract purporting to bind them by an express promise to deliver the plaintiff's goods in Bloomington, Ill. The only question was the question of fact, whether the agent had authority to make such a contract. By agreement of parties, that question was submitted to the court upon evidence ; and upon the evidence the court found that, as a matter of fact, the defendants were estopped to deny that the agent had such authority. In *Knight* v. *P. S. & P. R. Co.*, 56 Me. 234 (1868), the plaintiff purchased " a through ticket over three distinct lines of passenger transportation." The court said, " railroads may so issue their tickets and so conduct as to have the purchasers understand that they undertake for the whole route, in which case they will be held responsible to that extent." · There is nothing in these cases having any tendency to show that, in the absence of an express written contract, a carrier's undertaking beyond his route is not a question of fact.

In *Crafts & wife* v. *British & American Express Co.* (tried by jury in Coös, Nov. term, 1868), the defendants were carriers on the

Grand Trunk Railway from West Milan to Northumberland. At West Milan they received goods directed to Mrs. Crafts at Newbury, Vt., a place not on their route, but to which goods might be sent by other carriers from Northumberland. A part of the goods arrived at Newbury, and a part were lost. The court (BELLOWS, J.) left the question of the defendants' undertaking to carry the goods beyond their route to the jury as a question of fact. " The court instructed the jury that if the defendants through their agents received the goods at West Milan, directed to Mrs. Crafts at Newbury, Vt., and undertook to carry them there and deliver them to her, and they were lost, the defendants were liable, unless the loss was by the act of God or the public enemies ; and they would be liable, even though they were lost on some stage route after they left Northumberland and while in the hands of another express company. That if the undertaking was made to deliver them to a stage line and another express company on the route to Newbury, and they did so, they would not be liable for a subsequent loss. But if they undertook to carry and deliver them at Newbury, they might employ such intermediate agents as carriers as they pleased, but their responsibility as carriers would continue the same after leaving the Grand Trunk Railway as while on that road ; and that it was immaterial whether they had a general business connection with such intermediate agents or carriers or not, provided the undertaking to carry the goods to Newbury was shown." The only difference between this case and Muschamp's case is, that Baron ROLFE gave the jury his opinion of the weight of the evidence, and Judge BELLOWS did not. The jury in this case, without the aid of the judge's estimate of the evidence, concurred with the jury who tried Muschamp's case in finding a verdict for the plaintiffs ; and at the adjourned law term at Manchester, Aug., 1869, judgment was ordered on the verdict by the whole court, PERLEY, C. J., delivering the opinion. The case was not reported because it was not regarded as establishing any new or settling any doubtful point, or as otherwise important to be published. Gen. Stats., ch. 200, sec. 3.

At the same adjourned law term, Aug., 1869, at Manchester, was decided *Nashua Lock Co.* v. *W. & N. R. Co.*, 48 N. H. 339. That cause was submitted to the court on an agreed state of facts, and the court were unanimously of opinion that the plaintiffs were entitled to recover. PERLEY, C. J., said, " The contract between the plaintiffs and the defendants must be implied from the facts stated in the agreed case. * * * The general question is, whether the defendants undertook for the transportation of the goods through to New York, or only agreed to carry and deliver, or tender, them to the Norwich & Worcester Railroad. * * * The nature of the undertaking must be inferred from the facts stated in the agreed case." It is not expressly declared in the opinion that the defendants' undertaking was inferred as a matter of fact as distinguished from a matter of law, but this point is made certain by BELLOWS, C. J., in *Barter & Co.* v. *Wheeler & a.*, 49 N. H. 9, 27, 28 (decided in Dec., 1869), where, in commenting upon *Nashua Lock Co.* v. *W. & N. R. Co.*, he says, " in

the case of a continuous line formed by several distinct companies, each operating a distinct part of the entire line, but each empowered to contract for freight over the whole route and to receive pay for the whole distance, the receipts to be divided among the several companies in prescribed proportions, it would be competent for a jury to infer a joint contract by the several carriers to transport the goods over the entire route. It is quite well settled now that they have the capacity to make such joint contract, and we think that from the facts stated a jury might infer it." When a case is submitted to the court upon an agreed statement of facts, as *Nashua Lock Company* v. *Worcester & Nashua R. Company* was, the parties are supposed to intend that such facts may be found by implication from the facts agreed as a jury would be warranted in finding. That is the natural construction of an agreed case, in the absence of any express stipulation on the subject, and such is the construction given to agreed cases in this as well as in other jurisdictions. *Underhill* v. *Manchester*, 45 N. H. 214, 221.

In *Farmers & Mechanics Bank* v. *Champlain Trans. Co.*, 23 Vt. 186, 208, 210, 212, 213 (1851), Judge REDFIELD says, " If the law fixes the extent of the contract, in every instance, in the manner assumed, then most undoubtedly are the defendants liable in this case, unless they can show in the manner required some controlling usage. But if upon examination it shall appear that there is no rule of law applicable to the subject, and the extent of the transit is matter resting altogether in proof, then the course of business at the place of destination, the usage or practice of the defendants and other carriers, if any, at that port and at that wharf, become essential and controlling ingredients in the contract itself." Judge REDFIELD did not fail to see that Muschamp's case " considers it chiefly a matter of fact, to be determined by the jury as to the extent of the undertaking," by the expression " chiefly a matter of fact," taking into account the idea that the question was, of course, subject to the general and elementary rules of law upon which all contracts rest. Upon a thorough consideration of the subject, the learned judge sums up his own views and delivers the decision of the court thus: " All the cases, almost without exception, regard the question of the time and place when the duty of the carrier ends as one of contract, to be determined by the jury from a consideration of all that was said by either party at the time of the delivery and acceptance of the parcels by the carriers, the course of the business, the practice of the carrier, and all other attending circumstances, the same as any other contract, in order to determine the intention of the parties. The inquiry, then, in the present case, must come to this before the jury, whether it was reasonable for the plaintiffs, under the circumstances, to expect the defendants to do more than to deliver the parcel to the wharfinger. If not, then that was the contract, and that ended their responsibility, and the plaintiffs cannot complain of the defendants because the wharfinger was unfaithful. The defendants, unless they have, either expressly or by fair implication, undertaken on their part to do something more than deliver the parcel to the wharfinger, are no more liable for its loss than they would

have been had it been lost upon ever so extensive a route of successive
carriers, had it been intended to reach some remote destination in that
mode.    But if the plaintiffs can satisfy the jury that, from the circum-
stances attending the delivery or the course of the business, they were
fairly justified in expecting the defendants to make a personal delivery
at the bank, they must recover ; otherwise, it seems to us the case is
with the defendants."

The same judge, in his work on the Law of Railways, vol. 2, sec. 180, 3,
says, "There are many cases where the American courts have held the
carrier liable beyond the limits of his own route, upon the ground of
a special undertaking, either express or implied; but whether any such
contract exists is regarded as a matter to be determined from all the
facts and attending circumstances of the case, and will more generally
be an inference for the jury than the court, unless it depends upon the
effect of written stipulations."

*Morse* v. *Brainerd & a.*, 41 Vt. 550 (1869), was a proceeding in
chancery tried by the court upon facts and testimony reported by a
master.    The defendants, as receivers operating the Vermont Central
and Vermont & Canada railroads, received of the plaintiff, at Swan-
ton, Vt., certain cattle directed to Medford, Mass.    The cattle were
transported safely over the Vermont railroads, but were injured on the
lower and connecting roads.    The court say, "The company is liable
for injuries that occur beyond the termination of their own road only
when they stipulate to deliver the property at a point beyond.    *    *    *
If, then, the defendants are to be made liable in this case, it must be upon
the ground that they received the property in question under a contract,
express or implied, to deliver it at Medford, its place of destination.
Whether there was such a contract or not is mainly a question of fact,
to be determined upon the master's report and the evidence refer-
red to.    That there was no express contract for the delivery of this
property at Medford is conceded.    Was there an implied contract to
that effect?"    After stating the facts showing a joint transportation
line (such as the one in *Barter & Co.* v. *Wheeler & a.*, 49 N. H. 9, 11,
12, 26, referred to in *Nashua Lock Co.* v. *W. & N. R. Co.*, 48 N. H.
361), the court proceed thus : "These facts, and, in short, without
stopping to enumerate further, the great mass of facts and testimony re-
ported by the master, are consistent and many of them only consistent
with the idea of an assumed liability to transport the property, in this
case, from Swanton to Medford.    Such, we think, must have been the
understanding and expectation of Morse and the station agent at
Swanton, at the time the property was put on to the defendants' road
at that place."    Sitting as a court of chancery, and inferring the fact
from facts and evidence reported by the master, the court found the
mutual understanding of the parties that the defendants were to be
responsible beyond their own route.

*Nutting* v. *C. R. R. Co.*, 1 Gray 502 (1854), was submitted to the
court upon an agreed statement of facts, from which the court did not
infer the additional fact that the defendants undertook to carry beyond
their own route.    The defendants' liability, therefore, resting on the

official duty of their public employment, did not extend beyond their own route, and the plaintiff did not recover. The opinions of the English judges in Muschamp's case, on the *prima facie* weight of the evidence, were mistaken for opinions of law, and the court said, "We cannot concur in that view of the law." The real difference was a non-concurrence in the English estimate of the weight of evidence. In this and some other cases, judges, speaking of " a special contract" or " a positive contract " of a carrier to carry beyond his own route, must be supposed to mean a contract proved by other evidence than the general duty of the carrier's public employment, and not an express contract as distinguished from an implied one. *Moses* v. *B. & M. R.*, 24 N. H. 84, 88.

" In *Fitchburg and Worcester Railroad* v. *Hanna & a.*, 6 Gray 539 (1856), the arrangement of the plaintiffs was with another railroad and a steamboat company to and from New York. It appeared that, in receiving goods at New York to be carried over the plaintiffs' line, the steamboat company acted as the plaintiffs' agent. It followed, of course, that the plaintiffs could collect the whole freight, but were liable for damage done to the goods by the negligence of the steamboat company; and it was so held. But without such agency it would have been otherwise." *Darling* v. *B. & W. R. Co.*, 11 Allen 297. Such agency, of course, may be found by a jury from slight circumstantial evidence.

In *Najac* v. *B. & L. R. Co.*, 7 Allen 329 (1863), from an agreed state of facts the court found the fact that the defendants undertook to carry the plaintiffs' baggage beyond their own route.

In *Lowell Wire Fence Co.* v. *Sargent & a.*, 8 Allen 189 (1864), the plaintiffs sent by the defendants, who were expressmen between Lowell and Boston, a coil of wire fence, directed to Annapolis, in Maryland, and gave them a bill for the price of the fence to collect from the person to whom the package was addressed. The defendants carried the package and bill to Boston, and, according to the usual course of business, delivered them to Adams & Co.'s Express, by whom they were carried to Annapolis, where Adams & Co. collected the bill and the charges for freight, but the money received on the bill was never paid over by Adams & Co. The case was tried by a jury, who found a verdict for the defendants; and the plaintiffs alleged exceptions, which were overruled. Hoar, J., delivering the opinion of the court, said, " The court instructed the jury ' that they were to determine what the contract between the plaintiffs was; that if the contract was to carry the fence to Boston and there deliver it to Adams & Co., then the defendants, upon safely carrying and delivering the fence to Adams & Co. at Boston, would thereby be discharged from all liability to the plaintiffs on account of said fence and the bill therefor from that time, and would not be liable for any loss or neglect on the part of Adams & Co., or for the amount of the bill, even if Adams & Co. had collected and held the money.' The correctness of this instruction is the question presented by the bill of exceptions. There was no express contract in relation to the transportation of the fence; and whether. the implied contract was to carry it to Annapolis, or merely

to carry it to Boston and forward it thence by the ordinary lines of transportation, was certainly a question for the jury upon the whole evidence in the case ; in determining which, they would consider the nature of the business, the advertisements or notices given by the defendants, and all the circumstances tending to show the understanding of the parties.   It was therefore properly left to the jury."

In *Darling* v. *Boston & Worcester Railroad Co.*, 11 Allen 295 (1865), the defendants were " the carriers on the last line of transportation," and the injury done to the goods was done when they were in the possession of some other carrier, before they reached the defendants' line. The Michigan Central Railroad, the first carrier who received the goods, gave a receipt for them, which the court (construing it as an express written contract) declared was " so framed as to exclude the idea of joint responsibility with other carriers." And the court held there was no evidence tending to show any contract between the plaintiff and all the carriers jointly, and no evidence tending to show that the defendants were liable for damage done to the goods in the possession of some other carrier before they came to the defendants' line.

In *Gass & a.* v. *N. Y. P. & B. R. Co.*, 99 Mass. 220 (1868), the plaintiffs claimed, as matter of law, that the defendants were liable for goods which were burned on a steamboat, and which never were in the defendants' possession, on the ground that the steamboat company were agents of the defendants or in partnership with them.   The court held there was no evidence of such agency or partnership.

*Burroughs & a.* v. *N. & W. R. Co.*, 100 Mass. 26 (1868), seems to have been submitted to the court upon an agreed statement of facts. The plaintiffs' goods were destroyed on a steamboat in Long Island Sound by collision and fire, after they had been carried by the defendants to the end of their route.   The plaintiff sought to charge the defendants as common carriers beyond the line of their railway, on three grounds.   One was, that a station agent of the defendants had, by a written contract, expressly promised to deliver the goods in New York. But the court held that the facts were " clearly insufficient to warrant a court or jury in inferring that he had authority to bind the defendants as common carriers beyond the line of their own railroad."   The plaintiffs also relied upon a written contract between the defendants and the steamboat company.   But that contract expressly provided that each company should bear the losses happening on its own line.   The plaintiffs also relied upon a "freight tariff" posted in the defendants' stations.   But that expressly exempted the carriers from loss by collision or fire.   And the court, apparently trying the case as a jury would try it, upon the evidence, gave judgment for the defendants.

In *Pendergast* v. *Adams Express Company*, 101 Mass. 120 (1869), there was a written contract which, as the court held, expressly limited the undertaking of the defendants to forwarding the parcel " to their agent nearest or most convenient to the destination, and then delivering it to other parties to complete the transportation."   GRAY, J., delivering the opinion of the court, said, " When a common carrier is a corporation established for the purpose of transporting goods over a certain route,

goods delivered to such corporation, directed to a more distant place, are presumed by our law to be received for the purpose of being carried by it over its own route only, and then forwarded by another carrier to their destination. *Burroughs* v. *Norwich & Worcester Railroad Co.*, 100 Mass. 26. When there is no charter to indicate the limits of the carrier's business, and no written agreement between him and the other party, the question what was in fact the extent of his undertaking is a question for the jury. *Lowell Wire Fence Co.* v. *Sargent*, 8 Allen 189."

*Hill Mng. Co.* v. *B. & L. R. Corporation*, 104 Mass. 122 (1870), was submitted to the court upon an agreed statement of facts, with an agreement that the court might draw any inferences from the competent facts stated that a jury would be justified in drawing. And from the facts agreed, the court drew the inference of fact that the defendants (a corporation) undertook for the carriage of the plaintiffs' goods beyond their own line.

The supreme court of Connecticut put a low estimate upon the weight of the evidence usually introduced by the plaintiff in this class of cases; and peculiar views prevail in that State concerning the power of a corporation to bind itself by a contract for carriage beyond the line on which it is specially authorized by its charter to assume the public office and perform the duties of a carrier. And the court of that State, acting upon their opinion of the weight of the evidence and their views of corporate power, set aside verdicts as against the evidence, and order nonsuits in cases in which courts, entertaining a different opinion of the weight of the evidence and different views of corporate power as effected by estoppel in contracts, would not adopt such a practice. *Hood* v. *N. Y. & N. H. R. Co.*, 22 Conn. 1; *Elmore* v. *N. R. Co.*, 23 Conn. 457; *Naugatuck R. Co.* v. *W. B. Co.*, 24 Conn. 468; *Converse & a.* v. *N. & N. Y. T. Co.*, 33 Conn. 166.

In *Bostwick* v. *Champion & a.*, 11 Wend. 571, S. C. 18 Wend. 175, the question was of the liability of the defendants as partners, not as common carriers. The action was not brought upon any duty, obligation, or contract of a common carrier. The defendants were carriers on separate sections of a continuous line, with a community of interest in the profits of the entire line; and they were held to be partners. It has never been supposed that individuals engaged in the business of carriers were specially incapacitated to exercise the right of forming a partnership enjoyed by people in other kinds of business.

At the trial of *Weed* v. *S. & S. R. Co.*, 19 Wend. 534 (decided in 1838), the defendants moved for a nonsuit on the ground that they " had not the power to contract, and did not contract, to carry" the plaintiff's trunk beyond their own road. It does not appear that they had any desire to go to the jury on the question whether there was in fact a contract extending beyond their road, and it is not probable that they had any such desire, under the circumstances of that case. Their claim that they made no such contract was apparently placed upon the sole ground that, as a matter of law, they had no corporate power to make it. COWEN, J., delivering the opinion of the court, began by saying,

" The defendants, having undertaken to carry from the Springs to Albany, cannot now be received to say they were in truth carriers no farther than Schenectady, the termination of their own road."

At the trial of *St. John & a.* v. *Van Santvoord & a.,* 25 Wend. 660, it appeared that the defendants, owners of a line of tow-boats on the Hudson river between New York and Albany, received a box of goods marked for Little Falls, a place on a canal beyond Albany. The defendants carried the box to Albany and delivered it, according to the usage of business, to a canal-boat plying between Albany and Little Falls. On the arrival of the canal-boat at Little Falls, some of the goods were missing, and the box appeared to have been broken open. The plaintiffs objected to the evidence of usage, but it was received. The judge charged the jury that there was no evidence of any contract on the part of the defendants to carry the goods to Little Falls ; that the known usage of the trade (not brought home to the plaintiffs) formed part of the contract between the parties; and that if the defendants delivered the goods at Albany according to usage, and used ordinary diligence in procuring a safe conveyance and in forwarding the goods, they were entitled to a verdict. The jury found for the defendants, and judgment was rendered on the verdict. This judgment was reversed by the supreme court (in 1841), on the ground that the judge erred in holding that, as matter of law, there was no evidence from which a contract could be implied to carry the goods beyond Albany. NELSON, C. J., giving his own opinion of the weight of the evidence, said it appeared to him that such a contract was fairly to be inferred from the evidence. The decision amounts to this : the contract was what the parties understood it to be, and there was evidence from which an understanding that the defendants were to carry the goods beyond their line might be inferred. In 1843 the judgment of the supreme court was reversed, and the judgment of the court of common pleas affirmed, by the court of errors, by a vote of eighteen to five. Chancellor WALWORTH said the only question was, whether the judge of the court of common pleas was right in receiving evidence of the usage, and in telling the jury that the defendants had discharged their duty if they had carried the goods safely to Albany and had forwarded them by a safe canal line from there, and declared he had no doubt the judge was right in both particulars. The chancellor put his opinion on the ground that the only material evidence was the mark on the box, and the usage, and that both parties must have understood that the defendants would transport the box to the place where their business as common carriers terminated, and send it on in the usual way as forwarders, from that place. Putnam, senator, who concurred with the chancellor, said that, from the evidence given at the trial, the jury had a right to assume that the box in question was delivered to the defendants to be transported according to the business of the line, and that it was the province of the jury to determine the effect and extent of the implied contract between the parties. Porter, senator, dissented, on the ground that the question of an implied contract of the defendants to carry the goods beyond their line should have been left to the jury. In the

decision of this case, Muschamp's case (decided in 1841) was not referred to.   6 Hill 157.

In *Wilcox* v. *Parmelee*, 3 Sandf. 610 (1850), the court said that, in Muschamp's case, " The defendants were held liable," and, erroneously supposing that the defendants were held liable by the court, they seem to have adopted the verdict of an English jury as a rule of American law.

In *Hart* v. *R. & S. R. Co.*, 4 Seld. 37 (1853), the defendants owned the last of several roads forming a line from Whitehall to Troy.   The plaintiff purchased a through ticket at Whitehall, and passed over the entire line as a passenger, without change of car, and some of her baggage was lost.   The court, in their opinion, use this language : " The court charged the jury that it was for them to say whether it was proved that the defendant, by its agents, received the baggage and agreed to carry it to Troy ; and on the decision of the motion for a nonsuit, after all the evidence was given, the court stated it was a matter to be left to the jury.   The court was right both in the charge and in the refusal to nonsuit.   There were facts which it was proper to submit to the jury, who were the proper judges of the weight of evidence, and it would have been error to have refused so to submit them."

In *Wibert* v. *N. Y. & E. R. Co.*, 12 N. Y. 245 (1855), the question was of the defendants' liability for the detention of goods on their own road.   HAND, J., in the course of a dissenting opinion, said that in some of the cases the corporation to whom property was first delivered was held liable for the default of other corporations, and that where a carrier was in the habit of receiving and forwarding goods directed to any particular place, an agreement on his part to take them there had been presumed.

In *Schroeder* v. *H. R. R. Co.*, 5 Duer 55 (1855), it was found, by a judge deciding the facts as well as the law, that the defendants undertook to carry goods beyond their own line, and the question then was whether there was any evidence.

In *Hunt* v. *N. Y. & E. R. Co.*, 1 Hilton 228 (1856), it was held that there was no evidence of the defendants' liability for damage done to goods before they received them.

In *Dillon* v. *N. Y. & E. R. Co.*, 1 Hilton 231, it was held that there was no evidence of an undertaking of the defendants to carry beyond their own line.

In *Foy* v. *T. & B. R. Co.*, 24 Barb. 382 (1856), it was alleged in the plaintiff's complaint that the defendants contracted to carry a wagon from Troy to Burlington.   " On the trial, the plaintiff proved the allegations in the complaint."   No question was raised at the trial as to the defendants' liability beyond their own line.   The only objections made to the plaintiff's right of recovery were, that there was no sale of the property, that the property never was demanded, and that there was no proof of negligence.   In a *dictum*, HARRIS, J., expressed his opinion of the weight of the evidence tending to show a contract to deliver the wagon at Burlington, a place beyond the defendants' line.

In *Russell & a.* v. *Livingston & a.*, 16 N. Y. 515 (1858), the defend-

ants carried from Amsterdam to Vienna a package directed to a person at Port Gibson (a place beyond their line), " Care of Dawley, Express Agent, Vienna." Dawley, the defendants' agent at Vienna, delivered the package to a stage running to Port Gibson, and it was lost. It was decided to be erroneous to rule, as matter of law, that Dawley received the package as the plaintiffs' agent.

In *Quimby* v. *Vanderbilt*, 17 N. Y. 306 (1858), the question whether the defendant, a carrier from New York to Nicaragua, undertook to carry the plaintiff from New York by way of Nicaragua to San Francisco, was left to the jury, and it was held that there was evidence proper to be submitted to them.

*Hempstead* v. *N. Y. C. R. Co.*, 28 Barb. 485 (1858), was tried by a judge without a jury, and the judge found that the defendants did not contract to carry beyond their own line, and this finding was not set aside.

In *Cary* v. *C. & T. R. Co.*, 29 Barb. 35 (1859), the defendants' line was from Toledo to Cleveland. The defendants, at Toledo, sold to Miss Bedel (the plaintiff's assignor) tickets for Buffalo. The defendants moved for a nonsuit on the ground that no contract was proved to carry beyond Cleveland. The motion was denied, and there was a verdict for the plaintiff. ALLEN, J., delivering the opinion of the court, said, " That there was no proof of a contract on the part of the defendant to carry the lady and her baggage beyond the termination of its road cannot be alleged. The proof was, that she applied to the defendant's clerk and servant for a passage ticket by railroad from Toledo to Buffalo, and was furnished with tickets which carried her to Buffalo over the defendant's road and the other intermediate roads; and the defendant's clerk received the fare for the whole distance. Some contract was made by the defendant at that time; and if, upon the evidence, the defendant desired to make a question whether it was a contract for carriage by the defendant for the whole distance, or whether, in entering into the contract, the defendant represented and contracted for or in behalf of other corporations or individuals, as to a part of the distance, he was entitled to have such question passed upon by the jury; that is, if there was a doubt as to what the contract was, it was a proper question for the jury. But there was certainly evidence to carry the cause to the jury upon the question whether or not the defendant had contracted as alleged. * * * The court charged the jury * * * that the contract of the defendant was to deliver the trunk at Buffalo. * * * As the question relating to the discharge of the defendant from liability by the delivery of the trunk to the Painesville road depends entirely upon the terms of the contract and its validity, if for carriage of the passenger and her baggage east of Cleveland, the exceptions need not be further considered in this connection, except to repeat the remark before made that the defendant did not ask to have the jury decide what the contract in fact was. Had it done so, and the court had decided it as matter of law, it might perhaps have been error. The counsel did not object that the court, by passing upon the question, invaded the province of the jury, but the exception was based rather upon the ground that the

defendant had not contracted because it could not lawfully contract for service beyond Cleveland. In *Muschamp* v. *The Lancaster and Preston Junction Railway Co.* (8 M. & W. 421), in a case somewhat similar, it was treated by the court as a proper case for the jury to determine what the contract was,—whether the railway company had undertaken to carry a parcel beyond the terminus of its road, or had agreed to carry it to its terminus and there deliver it to another carrier for transportation. The court held that they could not say that the latter was the import of the contract, as was asked by the defendant to be decided in this case. It was assumed by the defendant's counsel to be a proper question for the court, as there was no dispute about the evidence ; and when a question is so treated, the party cannot, upon appeal, insist that it should have been submitted to the jury. *(Barnes* v. *Perine*, 2 Kernan 18.) If there was evidence upon which the jury might have found the contract as alleged by the plaintiff, rather than as claimed by the defendant, as a question of fact, the ruling and decision of the court will be sustained : in other words, there is no error for which the judgment will be reversed."

In *Chouteaux* v. *Leech*, 18 Pa. St. 224 (1852), the defendants were bound by a written contract. In *P. C. R. Co.* v. *Schwarzenberger*, 45 Pa. St. (9 Wright) 208, the carrier gave notice that it was not liable beyond its own route, and therefore the plaintiff failed to prove a mutual understanding that the carrier would carry the plaintiff and his baggage beyond the carrier's own route. In *B. & P. S. Co.* v. *Brown*, 54 Pa. St. 77 (1867), the question was left to the jury. *Jenneson* v. *C. & A. R. & T. Co.* (Dist. Court, Phil.), 4 Am. L. Register 234, was governed by an express written contract. STROUD, J., upon an examination of the authorities, expressed the opinion that when the only evidence is the direction of goods by marks beyond the carrier's route, the carrier is only bound to transport and deliver them according to the usage of the business. In a note to this case, the editors of the Register say (p. 239) that the contract for carriage beyond the carrier's route "is in general a question of fact, and is to be determined by the finding of a jury."

In *Bradford* v. *S. C. R. Co.*, 7 Rich. 201 S. C. (1854), it was held to have been properly left to the jury to find the defendant liable as a joint carrier. In *Bradford & a.* v. *S. C. R. Co.*, 10 Rich. 221 (1857), it was held that there was no evidence that the defendant was liable as a joint carrier. In *Kyle* v. *L. R. Co.*, 10 Rich. 382, the defendants were bound by a written contract to deliver goods beyond their own line. *Bennett* v. *Filyaw*, 1 Flor. 403, does not relate to the responsibility of a carrier beyond his route.

In *R. R. Co.* v. *Sullivan & a.*, 25 Ga. 228 (1858), there was a written contract to deliver goods at Augusta, Ga., and it was held that the direction on them, " Cha'st, So. Ca.," could not control the express undertaking.

In *Railroads, apts.,* v. *Spratt*, 2 Duvall 4 (1865), the appellants, being joint carriers with others, gave a through bill of lading for the transportation of goods from Louisville to New York, on which

the jury found a verdict against them, and the verdict was not set aside.

In *Carter & a.* v. *Peck,* 4 Sneed 203 Tenn. (1856), it was held (apparently as matter of law) that a carrier receiving, in advance, payment for transportation to a point beyond his route, thereby contracts to carry to that point.

In *U. S. Express Co.* v. *Rush & a.,* 24 Ind. 403, it was held to be the duty of a carrier to deliver goods, directed beyond his route, to the next carrier, according to the usual custom of business, and that in the written contract in that case there was no stipulation changing that duty.

In *Ill. C. R. Co.* v. *Copeland,* 24 Ill. 332, 337, 338 (1860), the court fell into the mistake of supposing that in Muschamp's case the defendants were held liable by the court as a matter of law: and upon that mistake the law of Illinois seems to be settled. *Ill. C. R. Co.* v. *Johnson,* 34 Ill. 389.

In *Candee* v. *P. R. Co.,* 21 Wis. 582, the supreme court of Wisconsin were disposed to follow *Ill. C. R. Co.* v. *Copeland,* 24 Ill. 332. In *Peet* v. *C. & N. W. R. Co.,* 19 Wis. 118, it was held that the defendants were bound by a written contract to carry goods beyond their own line. In *D. & M. R. Co.* v. *F. & M. Bank,* 20 Wis. 122, it was held that by the true construction of a written contract the defendants were not responsible beyond their own line.

In *Angle & Co.* v. *M. & M. R. Co.,* 9 Iowa 487, the opinions of English judges on the weight of the evidence were mistaken for opinions of law, and adopted as such.

These are some of the principal American cases usually cited on the question of the liability of a carrier beyond his own route, in the absence of an express written contract. Some of them are not in point. Many contain nothing but *dicta* on the subject. Some turn on writings held to be, or treated as, express contracts, the construction of which by the court shows the understanding of the parties, without the finding of a jury on parol or circumstantial evidence. Some are based on the mistake of supposing that in Muschamp's case the defendants were held liable by the court as a matter of law. Some are controlled or influenced by the mistake of supposing that in Muschamp's case the opinions of the judges on the *prima facie* weight of the evidence were opinions on the law. It would seem that in no one of them has the question been held to be, or been treated as, a question of law, where it was claimed to be a question of fact, or where the attention of the court was called to the distinction between law and fact,—a distinction which has been clouded by misapprehensions of Muschamp's case. In nearly all of them, when there is no decisive contract in writing, it is held to be, or practically treated as, a question of fact. There is much in the American authorities going strongly to show that Lord ABINGER was right, and there is nothing in them having any considerable tendency to show that he was wrong, when he said, in Muschamp's case, " The whole matter is therefore a question for the jury to determine what the contract was, on the evidence before them."

There are cases in which a carrier's liability depends upon the terminus of his route, the geographical extent of his public employment; where the question is to what point he has assumed the public duties of a common carrier, and how far he is required by his general public duty to carry goods under pain of an action against him. This is a question of fact. *Walker & a.* v. *Jackson & a.*, 10 M. & W. 161; *Johnson* v. *M. R. Co.*, 4 Exch. 367; *Richards* v. *L. B. & S. C. R.*, 7 Com. B. 839; *Crouch* v. *L. & N. W. R. Co.*, 14 Com. B. 255; *Williams* v. *Vanderbilt*, 29 Barb. 491. In some cases, the carrier's liability is considered in a manner tending to show that the question of his undertaking to carry beyond his route was not distinguished from the question of the extent of his route. The question whether the place to which goods are directed is beyond the carrier's route, and the question whether, if it is beyond his route, he undertook to carry the goods to it, may be contested in the same case; sometimes a single piece of evidence has a bearing on both of those questions; and there would often be an inconsistency in holding one of them to be a question of fact and the other a question of law.

In *Nashua Lock Co.* v. *W. & N. R. Co.*, 48 N. H. 339, 362, there is a statement of some of the consequences of holding, as matter of law, that, when goods are lost on some part of a continuous line of several associated carriers, the carrier on whose section of the line they were lost is alone liable. It is there said that it would often be difficult and sometimes impossible for the owner of the goods to learn where his loss happened; that he would have no means of learning himself, and would not, unless of a very confiding disposition, rely on any very zealous aid in his search from the carriers; that, if he should have the luck to make the discovery, he might be obliged to assert his claim for compensation against a distant party, among strangers, in circumstances such as would discourage a prudent man, and induce him to sit down patiently under his loss rather than incur the expense and risk of pursuing his legal remedy. The forlorn condition of the owner in such a case is put as an argument against holding, as matter of law, that the first carrier is not responsible beyond his own route.

On the other hand, in *Van Santvoord & a.* v. *St. John & a.*, 6 Hill 157, 163, 170, there are statements of the consequences of holding, as a matter of law, that a carrier is liable beyond his route. RHOADES, senator, says, "There are many men in this State, who are engaged as common carriers in the transportation of the produce of the country by land. One of these men receives a load of flour on board his wagon for the purpose of delivering it at some point on the Erie canal, the barrels being marked and directed to a town in the interior of the State of Maine. The carrier neglects to make a special contract that his liability is to cease at the point of delivery on the canal; but he delivers the flour in good order on the canal, and the property is forwarded from one line of transportation to another, until it passes into the hands of the last carrier on the route, by whose want of care it is lost. It would under such circumstances be a most severe and harsh rule of law which should make the person who first undertook the transportation

of the article liable for its loss.  Bockee, senator, depicts the consequences of such a rule as " most alarming to all who are engaged in freighting and transportation."  " Suppose," says he, " the box had been marked ' Brown's Hole, Rocky Mountains.' "  If the law implies a contract to deliver the box at that place, he observes, as it is the duty of every man faithfully to fulfil his contracts, the carrier " must abandon his ordinary avocations and business, leave the delights of domestic association, embark with his dear-bought freight, and follow the long lines of internal navigation till he reaches the head waters of the Yellow Stone.  Then he must traverse a vast desert, with Indian horses and pack-saddles, exposed to famine, to the wintry storms, to wild beasts and savages ; and, if Providence should protect him through every danger, he returns, after years of suffering, a worn-out beggar to a ruined home."

All the weight of these arguments from consequences is against holding the question to be one of law.  And they may be arguments proper to be addressed to a jury or other tribunal trying the facts of a case upon the question what the understanding of the parties was.

If the question in this case is of the mutual understanding of the parties, and if that question is one of fact, we are restrained by the constitution from holding it to be a question of law.  *State* v. *Hodge*, 50 N. H. 522–525.  The modern practice of trying common law cases by a judge without a jury, and the habit of inferring facts from an agreed statement of facts submitted to the court, and other influences besides those named in *State* v. *Hodge* (519–521, 525), may contribute to obscure the distinction between law and fact.  But when the obscurity is penetrated, and a question is discerned to be a question of fact, no influence can induce the court to decide it as a question of law.

The principal argument for deciding the question in this case as one of law, is drawn from the convenience of a uniform and certain rule.  No lack of such a rule has resulted in England from holding it to be a question of fact.  The verdicts of English juries seem to be sufficiently settled and invariable to answer any reasonable demand on that score.  And there would seem to be no cause to apprehend that any serious inconvenience will be experienced in this State from a want of uniformity and certainty in verdicts on questions of this kind.  The subject cannot be justly subjected to an absolutely inflexible rule.  " It might be consoling to the carriers and to others if we could lay down a rule of law somewhat more definite in this case.  But from the almost infinite diversity of circumstances as to steamboat carriage, that is impossible.  There will usually be, at every place, some fixed course of doing the business, which will be reasonable, or it would not be submitted to, and which will be easily ascertained on inquiry, and with reference to which contracts will be made, and which it is equally the interest and the duty of both parties to ascertain before they make contracts, and which it would be esteemed culpable negligence in any one not to ascertain, so far as was important to the correct understanding of contracts which he was making."  *F. & M. Bank* v. *Champlain Trans. Co.*, 23 Vt. 213, 214.

And if, in ordinary classes of cases in which a fixed and uniform rule would be of great utility, there were danger that verdicts would be variable and uncertain, the danger might not be wholly obviated by holding the question to be one of law.  It is said, in *Nashua Lock Co.* v. *W. & N. R. Co.*, 48 N. H. 346, 357, 363, that there is no little confusion and contradiction of authority respecting the liability of a carrier beyond his own route ; that a review of the American cases shows but too plainly that if our courts have differed from the English, they are far from agreeing among themselves in any principle or doctrine that can be called the American rule; that there is not only much confusion, but no little conflict in the American authorities; and that the perplexing diversity of decision on this subject is such that there would seem to be no remedy unless the national legislature can provide one under the power given by the constitution to regulate commerce. If such is the condition of the authorities, it is proper to be considered in the choice of the tribunals by which the subject is to be settled and put at rest.  If courts are now obliged to confess that their inability to establish a uniform rule by their own decisions has thrown the country into such confusion that the interposition of congress is necessary, this is not a favorable occasion for insisting that the need of uniformity requires the matter to be adjudicated by the court instead of the jury. And if the confusion of the authorities is much less than has been supposed, still an examination of them shows that juries have been more successful than courts in establishing a uniform system of rules on this subject.

One serious objection against the practice of turning fact into law is, that it introduces arbitrary rules and disorganizing exceptions into the scientific system of the law, overwhelms that reason which is the life of it (Co. Lit. 394 b.), and changes the law into a chaotic collection of fragmentary and incoherent regulations, to be mastered only by sheer force of a rare and marvellous memory.

But the constitutional view is the only one necessary to be considered, because it is conclusive.  If trial by jury is as valuable as it seemed to the founders of our institutions, the danger of holding a matter of fact to be a matter of law outweighs the inconvenience of any uncertainty likely to be produced by verdicts of juries on the liability of carriers beyond their own routes.  A single precedent of a matter of fact turned into law is a dangerous thing where precedent is authority.  " One precedent creates another.  They soon accumulate, and constitute law.  What yesterday was fact, to-day is doctrine. Examples are supposed to justify the most dangerous measures, and where they do not suit exactly, the defect is supplied by analogy."   If the court may invade the province of the jury at one point, they may invade it at all points.  If they can appropriate a part of it, they can appropriate the whole, and, uniting the offices of judge and jury, which the constitution has divided, destroy the check and balance which have been deemed essential to the judicial branch of a free government. And, were it conceded that we are not now menaced by those governmental invasions of popular rights which our constitutional trial by

jury was chiefly intended to defeat, we do not know to what danger future generations may be exposed, nor to what use a precedent, apparently harmless in itself, may hereafter be applied.    Whether trial by jury is as valuable as it seemed to the founders of our institutions, is a question not to be debated before a tribunal sworn officially to support that trial as an institution established by the fundamental law.*

Upon the question of the understanding of the parties in this case, it may be doubtful whether the mere reception by the defendants of the parcel, directed to a place beyond their route, is evidence of an undertaking to carry the parcel to that place, or to be responsible for its carriage beyond Boston.    It may be that they were bound to receive it, and to carry it to the end of their route, and to deliver it there to the next express, according to the usage of the business.    If they were bound by the official duty of their public employment to receive it, how could their reception of it be evidence of a contract outside of and beyond their official duty ?    If their reception of it was within the reach and comprehension of their office, if they could not refuse to receive it and carry it to the next express at the end of their route under pain of an action against them, how could the performance of such a duty be evidence of a contract to perform more than that duty and to serve the plaintiff beyond their route ?    If the defendants had attempted to throw off a part of the official duty of their public employment between Portsmouth and Boston by a notice given to the plaintiff, there would be no presumption that the plaintiff had waived his legal right and made a contract to release them from a duty which he could require them to perform, or from a responsibility which he could require them to bear.    *F. & M. Bank* v. *Champlain Trans. Co.*, 23 Vt. 205; *Moses* v. *B. & M. R. R.*, 24 N. H. 88, 89.    There would be no presumption that he made a contract to relieve them from their obligation to serve him in anything within the reach and comprehension of their office, which extends from Portsmouth to Boston.    And how could a presumption be raised, from their rendering him service between Portsmouth and Boston, which they were bound to render, that they contracted to render him service beyond Boston, which they were not bound to render ?

But if the plaintiff did not know that the defendants were carriers only as far as Boston, if he believed they were carriers to Reading, if he would not have delivered the package to them had he known they would deliver it to another carrier, and if there was anything in their words or conduct intended to mislead the plaintiff, or which would have induced a man of ordinary care and prudence to entertain the plaintiff's belief and to act upon it, a case of estoppel might be made out.

---

* For cases drawing the distinction between law and fact, see *State* v. *Bartlett*, 43 N. H. 230, 231; *Pitkin* v. *Noyes*, 48 N. H. 303, 304; *Lisbon* v. *Lyman*, 49 N. H. 563, 564, 568; *State* v. *Jones*, 50 N. H. 369; *State* v. *Hodge*, 50 N. H. 510.                                        REPORTER.

There might be a case in which a carrier's silence and omission to give notice of the extent of his route would be evidence tending to show, by way of estoppel, a mutual understanding that the carrier undertook to carry beyond his route.

Upon the question of a mutual understanding in the absence of conclusive proof in writing, there would ordinarily be the direct testimony of the parties themselves. *Norris* v. *Morrill*, 40 N. H. 395; *Severance* v. *Carr*, 43 N. H. 65; *Graves* v. *Graves*, 45 N. H. 323; *Hale* v. *Taylor*, 45 N. H. 405; *Delano* v. *Goodwin*, 48 N. H. 203. The omission of either party to testify on that point might be evidence against him. *Lisbon* v. *Lyman*, 49 N. H. 568, 575, 580. What was said and done at the time the plaintiff delivered the package to the defendant might give some light on the question. The non-payment of freight in advance, or the prepayment of the whole as one charge or as several charges, might be competent. The usage of the defendant and other carriers might be important. If these defendants and the carrier beyond their route were partners in the through business between Portsmouth and Reading, or had an association or agreement among themselves in relation to it, their partnership or mutual agency might be material; and the absence of such partnership or agency might be material. *Burroughs & a.* v. *N. & W. R. Co.*, 100 Mass. 29, 30; *Hill Mng. Co.* v. *B. & L. R. Co.*, 104 Mass. 134. There might be a great variety both of direct and circumstantial evidence tending to show a mutual understanding, actual or constructive, effected in the minds of the parties by a real concurrence, or in contemplation of law by estoppel. No such mutual understanding, binding the defendants to carry the plaintiff's parcel beyond Boston, was found by the judge who tried the facts in this case.

The authorities on a carrier's liability beyond his own route seem not generally to put it upon the law of the State in which his contract is to be performed. Neither do they expressly make an exception to take this class of cases out of the general rule that the construction and force of a contract are governed by the law of the State in which it is to be executed. *Barter & Co.* v. *Wheeler & a.*, 49 N. H. 29; *Thayer* v. *Elliott & a.*, 16 N. H. 102; *Whitney* v. *Whiting*, 35 N. H. 462; 2 Kent Com. 459. If the part of the defendants' contract, which was to be performed in Massachusetts, is governed by the law of Massachusetts, the decisions of that State furnish no ground for granting a new trial in this case. If the defendants should to-morrow obtain one or more charters incorporating them as common carriers between Portsmouth and Boston, and they should, as a corporation, receive another parcel under the circumstances of this case, we cannot suppose that their responsibility would be held, as a matter of law, in Massachusetts, to be different from what it now is. The fact that by the terms of their charter they were carriers only between Portsmouth and Boston, might be evidence on the question whether they intended to undertake for carriage beyond Boston. It would seem that any presumption drawn from their charter, as to their intention on that point, would be an inference of fact and not of law. But the

defendants not being a corporation, it seems to be expressly settled that, by the law of Massachusetts, the question whether they undertook to carry the plaintiff's parcel beyond Boston is a question of fact. The judge who tried the case found a general verdict for the defendants, and there must be

*Judgment on the verdict.*