**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MARCUS TRUCKING CO., Inc., Respondent.**

**No. 118, Docket 26336.**

United States Court of Appeals Second Circuit.

Argued Dec. 9, 1960.

Decided Jan. 26, 1961.

---

————◆————

Melvin Welles, Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles and Robert Sewell, Attys., National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

William Biederman, New York City, (Harris J. Klein and Irving Klein, New York City, of counsel), for respondent.

Before CLARK, WATERMAN and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

This petition for enforcement brings before us another aspect of the N.L.R.B. "contract-bar" rule, which has recently concerned us in Local 1545, United Brotherhood of Carpenters and Joiners v. Vincent, 1960, 286 F.2d 127, and in N. L. R. B. v. Lundy Manufacturing Corp., 1960, 286 F.2d 424. In Local 1545 a union claimed the rule prevented the Board from ordering an election; in Lundy an employer urged that it precluded the Board from holding him guilty of an unfair labor practice for discouraging another union during the period of the contract bar. Here it is the Board that relies on the rule; it contends that it was an unfair labor practice for an employer to recognize another union during the protected period. Although not without some misgivings, we uphold generally the Board's determinations of fact and of law. Consequently, we enforce its order, but with modifications we shall discuss.

I. *The Facts.*

Respondent, Marcus Trucking Company, having its garage at Monroe, N. Y., transports milk and milk products in New York and New Jersey. In July, 1956, it became a member of the Dairy Transport Association, a New York membership corporation, one of whose functions is to represent members in labor matters; respondent executed a docu-

ment appointing the Association its attorney-in-fact for such matters. Thereupon the Association and Local 770, I.B. T., which had been recently certified as exclusive bargaining representative of Marcus' drivers, extended a 1955 contract to cover them.

The 1955 contract was to terminate July 31, 1957. On May 29, 1957, the Association held a meeting of its members, including Marcus. The members voted to dissolve the existing powers of attorney, but appointed a committee to negotiate a new labor contract. New powers of attorney were sent to the members; Marcus signed such a power, but claimed this not to have been effective since it called for an acceptance by the Association which did not occur. *Per contra* the General Counsel contended the dissolution of the earlier power was ineffective as a revocation because the power provided that revocation could only be made by registered mail not later than December 31 of any year, and also because respondent had agreed to keep the power alive until May 31, 1958, and the action taken on May 29, 1957 did not bind the Association as a consent to revocation since it was a vote by the members rather than the directors, see N. Y. General Corporation Law, McK.Consol. Laws, c. 23, § 27.

Bargaining between the Association's committee and three union officials, Decker, Hickman and Hickey, took place in June, July and August, 1957; Charles H. Marcus, originally vice president and later president of respondent, was not a member of the committee but attended some sessions as an observer. Dissatisfied with lack of progress, Local 770 struck the members on August 20; the strike was shortly ended by an oral agreement with the committee as to the major provisions of a new contract. Respondent thereupon adopted wage rates and overtime provisions in accordance with the oral agreement, although Charles Marcus told the President of the Association he did not like these. Negotiations for the contract went on into November, 1957, and January, 1958.

On January 20, 1958, the Association and Local 770 signed a memorandum agreeing on a draft previously submitted by the union together with a number of changes outlined in the memorandum. At some time between January 28 and February 3, 1958, the Association and Local 770 executed a contract for the period August 1, 1957–July 31, 1960, embodying this agreement. Suffixed to the contract was a legend "Dairy Transport Association Inc.'s authority to execute the foregoing agreement on behalf of this organization is confirmed," with spaces for the signatures of the members, including respondent. A quorum failed to attend a meeting of the Association called to obtain such signatures, and the spaces provided for them remained blank. The President of the Association testified the negotiating committee's authority was limited to a certain increase in wages, which the agreement exceeded. Meanwhile, on January 9, 1958, respondent wrote the Association "revoking our power of attorney with the Association, if any did exist at any time prior to this writing." The General Counsel claimed this was ineffective both because of the contract provision cited above and because it was not sent by registered mail before December 31, as the first power of attorney required.

A sore point with Marcus, both before and after January 20, 1958, was the union's demand for time and a half for more than 10 hours per day; Charles Marcus complained repeatedly to his drivers that he was unable to bid competitively against another trucker whose contract, with Local 602, I.B.T., did not contain such a provision. Late in April or early in May, 1958, a large majority of respondent's drivers held a meeting, chaired by Meisner, the shop steward; they instructed Meisner to see whether one of four I.B.T. locals, including 602, would take them. There is no evidence that respondent stimulated the meeting, save as this may have been done indirectly by Charles Marcus' complaints as to the effect of the overtime payments on respondent's business. Petitions for transfer to Local 602 were signed by 35 of respondent's 46 drivers.

Local 770 responded by removing Meisner as shop steward, appointing Bedford in his stead, and calling a strike on the night of May 30. The strike was abortive. Bedford was the only employee who joined the protesting group that formed outside respondent's garage; all the other employees continued to work. However, during the early morning hours, Charles Marcus drove to Middletown, N. Y., to confer with the Local 770 officials. They presented him with a contract covering his seven mechanics; this he refused to sign. They also requested him to sign the confirmation of the contract negotiated by the Association with respect to the drivers. The testimony is in complete accord that he did not sign but in the sharpest discord as to why. Charles Marcus testified he declined because of the petitions for transfer to Local 602, Hickman and Decker that he did so because "I have got a contract [with Local 770], and there is no reason why I should sign this one." On Charles Marcus' return to Middletown, the 602 representative demanded he sign a contract with a union security clause but without the offending overtime provision, threatening a really effective strike if he did not. Respondent complied.

The only other facts required to be stated at this point relate to Bedford. He was on vacation from June 15 to June 21, 1958. On returning he found he had been assigned a run to New York instead of upstate where he had previously been. Calling Charles Marcus to complain, Bedford was told, as he testified, "You have lost your seniority * * * Because you are not a member of Local 602. And you have been—they have told me to drop you to the bottom of the list."

II. *The Board's order.*

Upon this record the Board, on March 11, 1960, ordered Marcus to cease and desist from recognizing Local 602 and from giving effect to the contract of May 30, 1958, unless and until Local 602

is certified by the Board as the representative of Marcus' drivers; to recognize Local 770 as such representative and give effect to the collective bargaining agreement until July 31, 1960; to "restore to its employees * * * the system of overtime pay existing prior to May 30, 1958, and make such employees whole for any loss of earnings they may have suffered by reason of the elimination of such overtime pay"; to reimburse its employees the dues, fees and assessments they have paid Local 602; and to restore Bedford to his prior seniority status.

The Board does not charge that Marcus pressured its employees into transferring to Local 602, and the evidence would not support such a charge. The claim is rather that when an employer who has made a valid collective bargaining agreement with a Board-certified union recognizes another union during the period of "contract-bar" protection— now two years, Pacific Coast Assn. of Pulp & Paper Manufacturers, 121 N.L.R.B. 990 (1958)—he thereby violates various subsections of § 8(a) of the Act enumerated hereafter. 29 U.S.C.A. § 158(a).

III. *The Board's determination that respondent entered into a new contract with Local 770.*

Before we reach the question of law thus presented, we must consider the indispensable premise, namely, that respondent became bound to the three year contract between the Association and Local 770 signed in the winter of 1958. The Examiner's finding to this effect seems to have rested on four bases: (1) the alleged ineffectiveness of respondent's revocations of the 1956 power of attorney; (2) respondent's alleged failure to comply with Board-prescribed "tests for withdrawing effectively from multi-employer bargaining"; (3) apparent authority of the negotiating committee; and (4) conduct of respondent evidencing an intention to be bound—the two latter being grouped somewhat misleadingly under the rubric of "ratification." The Board stated in a footnote that it was unnecessary to pass on the two

former grounds; it should have overruled them and thereby prevented repetition of error. The first ground ignored the elementary principles of agency that "An agreement that the authority is to be revoked or renounced only in a particular manner is ineffective"; American Law Institute, Restatement of Agency 2d, § 119 comment a, and that "A statement in a contract that the authority cannot be terminated by either party is effective only to create liability for its wrongful termination," id. at § 118 comment b. The second ground was equally indefensible. Passing the question whether the Board has power to alter the rules of agency applicable in multi-employer bargaining, neither Retail Associates, 120 N.L.R.B. 388 (1958), the opinion relied on by the Examiner, nor the cases cited in that opinion, McAnary & Welter, Inc., 115 N.L.R.B. 1029 (1956), and Jahn-Tyler Printing & Publishing Co., 112 N.L.R.B. 167 (1955), go so far as to decree that a member of a multi-employer unit may be held to a contract which it has neither authorized nor ratified; all these cases arose under § 9, 29 U.S.C.A. § 159, and the Board merely declined to alter the appropriate unit for an election where recantation by a union or an employer, formerly a party to multi-employer bargaining, had come too late.

The reason why the Board found it unnecessary to consider these issues was because it agreed "with the Trial Examiner, and for the reasons stated by him, that the conduct of Respondent, through May 30, 1958, constituted a ratification of the collective bargaining agreement * * *" Much of respondent's conduct which the Examiner found significant does not seem so to us. It is hard to see how anything done prior to January 20, 1958, can show admission or "ratification" of a contract not made until then in any event, although it might be relevant as to apparent authority. Respondent's placing the wage increases and overtime payments in effect after the August 20, 1957 strike seems as consistent with a desire to go along with the union for a while and avoid trouble as

with a manifestation of intent to commit itself for a three-year term—with automatic increases at the end of each year. The Examiner stressed that Marcus complained about the overtime payments, yet continued to make them save for a temporary cessation for a month. But the events of August 20 had doubtless educated Marcus as to the likely consequences of failure to do this, and this evidence also is as consistent with Marcus' having accepted the terms negotiated by the Association as a modus vivendi, as with its considering itself firmly bound. Its continued check off of dues to Local 770 pursuant to unrevoked authorizations has even less probative value. Beyond this there were Charles Marcus' attendance at the bargaining sessions, itself quite inconclusive; the Examiner's acceptance of the testimony of Hickman and Decker that Marcus did not protest the Association's authority and his refusal to credit Charles Marcus' contrary testimony, and Marcus' failure to communicate to the union the January 9, 1958, revocation of the power of attorney, both significant in countervailing respondent's case rather than in supporting the General Counsel's; Hickman's testimony that Marcus said in December, 1957, that the men "were being paid according to the agreement" (not yet made); Decker's testimony that he had informed Marcus in March, 1958, that the union would have to "knock off" seven men "pursuant to Section 5 of the contract" if they did not pay their dues; and, finally and most important, again rejecting Charles Marcus' testimony and accepting Decker's and Hickman's, that "early on May 30, 1958, before the contract with Local 602 had been signed, Marcus unequivocally admitted to Local 770's representatives that the Respondent was under contract to Local 770."

Whether respondent's being bound by the contract of January 20, 1958, is a question of law or of fact, an issue discussed below, what Charles Marcus said on the night of May 30 is surely a question of the latter sort. Here the Examiner chose to credit what he described, with perhaps unwitting felicity, as "a synthesis of the credited testimony of Hickman and Decker," and not to credit Charles Marcus, although he does not tell us why.[1] Synthetic is exactly how Hickman's and Decker's testimony as to the May 30 conversation strikes us. Significantly they gave no such testimony on their initial appearance on the stand, although the incident was plainly of the first importance if it occurred; their testimony came only on rebuttal and it seems most improbable that Marcus would have gone to such pains to declare himself bound to Local 770 when he knew its "strike" had proved a failure and deliverance by Local 602 was at hand. However, that is not enough to warrant rejection of the finding. Even after Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456, this Court has said it will not upset the Board's approval of the Examiner's evaluation of oral testimony as reliable, "unless on its face it is hopelessly incredible," N. L. R. B. v. Dinion Coil Co., 2 Cir., 1952, 201 F.2d 484, 490, or "unless we can say that the corroboration of this lost [demeanor] evidence could not have been enough to satisfy any doubts raised by the words," N. L. R. B. v. James Thompson & Co., 2 Cir., 1953, 208 F.2d 743, 746. Perhaps this Court has again [2] displayed greater self-abnegation than Congress has desired; apparently other circuits think so, and the leading text approves their view, see 4 Davis, Administrative Law Treatise, § 29.06 (1958). On the other hand, nothing in Universal Camera, in the legislation there considered or in the history reviewed, seems to cast any reflection on Mr. Justice Stone's statement

1. The Examiner drew no adverse inference from General Counsel's failure to extract any testimony on this subject from Bedford, who was present on May 30, although he discredited Marcus' testimony as to protests over the negotiating committee's lack of authority on the ground that the Association officers alleged to have heard such protests were not called.

2. See Jaffe, Judicial Review: Question of Fact, 69 Harv.L.Rev. 1020, 1030 (1956).

in N. L. R. B. v. Columbian Enameling & Stamping Co., 1939, 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660, that evidence is substantial if it is "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury," and our rulings as to review of credibility conform to that test. Applying those rulings, we cannot say that Hickman's and Decker's testimony as to Charles Marcus' admissions on the night of May 30 was "hopelessly incredible" or beyond the power of demeanor evidence "to satisfy any doubts raised by the words"; and their testimony alone would go a long way, if not, indeed, all the way, needed to support the finding of "ratification."

■■ However, even if we were free to use our own judgment and reject Hickman's and Decker's testimony, we would be required to uphold the Board's finding that respondent became bound to the Association contract. For (1) this is a "question of fact" within § 10(e) of the National Labor Relations Act, 29 U.S.C. A. § 160(e), and (2) we cannot disturb findings of such a "fact" based on inferences within the range of reason although we should not have drawn them ourselves.

(1) The controversy whether application of established legal standards to raw evidentiary material is a question of law or of fact is an old one.[3] Professor Jaffe supports Holmes' narrow definition of "fact": "A finding of fact is the assertion that a phenomenon has happened or is or will be happening independent of or anterior to any assertion as to its legal effect" or "a description of a phenomenon independent of law making or law applying." Judicial Review: Question of Law, 69 Harv.L.Rev. 239, 241, 242 (1955); on that view the mak-

ing of a contract would be a question of law, not of fact. Analytically that seems, indeed, to be sound, and this may well be the proper construction of "fact" in Fed.R.Civ.Proc. 52(a), 28 U.S.C.A., as we have indicated in E. F. Drew & Co. v. Reinhard, 2 Cir., 1948, 170 F.2d 679, 684 and other cases. But the issue in a case like this is the different one whether Congress adopted so restrictive a notion in delineating the respective functions of administrative agencies and courts in statutes such as § 10(e) of the National Labor Relations Act, 29 U.S.C.A. § 160 (e), making conclusive "the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole."[4]

The cases presenting the issue of "question of fact" vs. "question of law" seem to fall into three major groupings, although, as would be expected, the lines between them are fuzzy:

(a) Cases, typified by Consolidated Edison Co. of N. Y. v. N. L. R. B., 1938, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126; N. L. R. B. v. Southern Bell T. & T. Co., 1943, 319 U.S. 50, 60, 63 S.Ct. 905, 87 L. Ed. 1250, and Corn Products Refining Co. v. F. T. C., 1945, 324 U.S. 726, 739, 65 S.Ct. 961, 89 L.Ed. 1320 [discrimination], where the chief problem is the propriety of an administrative conclusion that raw facts, undisputed or within the agency's power to find, fall under a statutory term as to whose meaning, at least in the particular case, there is little dispute;

(b) Cases where there is dispute both as to the propriety of the inferences drawn by the agency from the raw facts and as to the meaning

---

3. A famous instance was the debate between Holmes and Thayer with respect to negligence, see Holmes, The Common Law (1881), 126; Thayer, A Preliminary Treatise on Evidence at the Common Law (1898), 228; but the history can be traced long before that, see Mr. Justice Doe in Gray v. Jackson, 1871, 51 N.H.

9, discussing Muschamp v. L. & P. J. R. Co., 8 M. & W. 421 (1841).

4. Other statutes using the same or similar language are listed in Stern, Review of Findings of Administrators, Judges and Juries: A Comparative Analysis, 58 Harv.L.Rev. 70, 76 (1944).

of the statutory term, e. g., Rochester Tel. Corp. v. United States, 1939, 307 U.S. 125, 145, 59 S.Ct. 754, 83 L.Ed. 1147 [control]; O'Leary v. Brown-Pacific-Maxon, Inc., 1951, 340 U.S. 504, 71 S.Ct. 470, 95 L. Ed. 483 [course of employment];

(c) Cases where the only or principal dispute relates to the meaning of the statutory term, e. g., Gray v. Powell, 1941, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301 [producer]; Davies Warehouse Co. v. Bowles, 1944, 321 U.S. 144, 64 S.Ct. 474, 88 L.Ed. 635 [public utility]; N. L. R. B. v. Hearst Publications, Inc., 1944, 322 U.S. 111, 130–131, 64 S.Ct. 851, 88 L.Ed. 1170 and Packard Motor Car Co. v. N. L. R. B., 1947, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 [employee]; Social Security Board v. Nierotko, 1946, 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718 [back pay]; N. L. R. B. v. Highland Park Mfg. Co., 1951, 341 U.S. 322, 71 S.Ct. 758, 95 L.Ed. 969 [national or international labor organization].[5]

▬▬▬▬ The cases in the last group quite clearly present questions of law; hence they are not governed by statutes such as § 10(e) of the Labor Act but

raise the different issue of the degree of deference which courts should pay to decisions of administrative agencies interpreting the statutes that they apply.[6] On the other hand, the cases in the first group seem almost always to be regarded as presenting "questions of fact."[7] The instant case differs only in that the pertinent legal terms, such as "contract," "authority," and "ratification," are not contained in the relevant section of the statute. This would be a significant difference if there were doubt as to the meaning of the terms and the question was thus one of "law," for then statutes such as § 10(e) would not govern and the reason for some judicial deference to administrative expertise in the interpretation of legal language contained in the very act which the agency administers would not apply. But if the application of undisputed legal terms in the statute to raw facts is a "question of fact" within § 10(e), as it has been held to be, it is hard to find any basis for not reading these same words in § 10(e) as covering the application of equally undisputed non-statutory legal standards. We hold they do.

▬▬▬▬ (2) Even so, the Board's finding may stand, under § 10(e), only "if supported by substantial evidence on the

5. Of course, this catalogue does not exhaust the situations presented in judicial review of administrative findings—another that comes readily to mind is where the agency has acted under a broad statutory policy as to whose detailed application it necessarily has wide discretion, e. g., whether "public convenience and necessity" requires the establishment or permits the abandonment of transportation service, see United States v. Detroit & Cleveland Navigation Co., 1945, 326 U.S. 236, 241, 66 S.Ct. 75, 90 L.Ed. 38; American Airlines, Inc. v. C. A. B., 1951, 89 U.S.App.D.C. 365, 192 F.2d 417.

6. See Jaffe, 69 Harv.L.Rev. at 251–57, 263–64.

7. Professor Jaffe recognizes, 69 Harv.L. Rev. at 242–46, that his definition of "fact" must be qualified "where a word of common meaning is itself used in a statute." And it has been forcefully urged that the distinction between law and fact is not necessarily the same when

an appellate court is reviewing the action of an administrative agency, or a jury, as when it reviews the decision of a judge, Stern, op. cit. fn. 4, at 80–89, 105. Cf. the opinions of Chief Judge Parker and of Judge Soper in N. L. R. B. v. Southland Mfg. Co., 4 Cir., 1952, 201 F. 2d 244. This would support John Dickinson's much older formulation, Administrative Justice and the Supremacy of Law (1927), 168: "Where the only ground which a court can give for its difference from the administrative body is limited to mere difference of opinion as to some matter or matters peculiar to the case, or some difference in inference from those matters, then the court should not disturb the opinion or inference of the fact-finding body unless the latter is plainly beyond bounds of reason; for the difference is one of discretion, or 'fact.'" See, to much the same effect, Ray A. Brown, Fact and Law in Judicial Review, 56 Harv.L.Rev. 899, 902–03, 904–05 (1943).

record considered as a whole," and we reach the question of the extent to which we must respect inferences drawn by the Board from evidentiary facts that are undisputed or within the Board's power to find. Doubts that the statement in N. L. R. B. v. Nevada Consolidated Copper Corp., 1942, 316 U.S. 105, 107, 62 S.Ct. 960, 961, 86 L.Ed. 1305, "if the findings of the Board are supported by evidence the courts are not free to set them aside, even though the Board could have drawn different inferences," had survived the Taft-Hartley amendments, see Universal Camera Corp. v. N. L. R. B., 340 U.S. at pages 485–486, 71 S.Ct. at page 463, 95 L.Ed. 456, were removed, and hopes that it had not were blighted, by Radio Officers Union, etc. v. N. L. R. B., 1954, 347 U.S. 17, 50, 74 S.Ct. 323, 98 L.Ed. 455. Neither is this doctrine with respect to inferences limited to inferences from evidentiary facts to the "fact" made determinative by the statute rather than, as here, to an intermediate "fact" without statutory significance in itself; "even as to matters not requiring expertise a court may [not] displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." 340 U.S. at page 488, 71 S.Ct. at page 465.

We are told again that other circuits have been less self-denying in this matter of reviewing inferences, sometimes by resort to what is called "the important qualification that the reviewing court may substitute its judgment if it chooses. to turn the question of inference into a question of law," 4 Davis, Administrative Law Treatise, § 29.05 (1958), see also Cooper, Administrative Law: The 'Substantial Evidence' Rule, 44 A.B.A.J. 945,, 948 (1958), in Gellhorn & Byse, Administrative Law, Cases and Comments (1960), 470–71. We can find no sufficient basis for doing this in a case where, as here, the inference is within the range of reason although not what we would have chosen, so long as; the statement in N. L. R. B. v. Columbian Enameling & Stamping Co., supra,, stands. See Jaffe, Judicial Review: Question of Fact, 69 Harv.L.Rev. 1020,, 1028 (1956).[8]

## IV. The unfair labor practice.

We now must consider the validity of the Board's conclusion that respondent's recognition of Local 602 during the period when Marcus' agreement with Local 770 was entitled to. "contract-bar" protection came within the mandate that an employer must not "interfere with, restrain, or coerce employees in the exercise of the rights.

8. A basis for a contrary view would be furnished ·by the statement in Pennsylvania R. Co. v. Chamberlain, 1933, 288 U.S. 333, 339, 53 S.Ct. 391, 393, 77 L.Ed. 819, that even in a jury case "where proven facts give equal support to each of two inconsistent inferences * * * judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences against the other, before he is entitled to recover." However, we doubt the Supreme Court would regard this as a correct formulation today; the test now seems to be that a verdict may be directed only "When the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict," Brady v. Southern Ry. Co., 1943, 320 U.S. 476, 479, 64 S.Ct. 232, 234, 88 L. Ed. 239. See Tennant v. Peoria & P. U. Ry. Co., 1944, 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520; Lavender v. Kurn,. 1946, 327 U.S. 645, 653, 66 S.Ct. 740, 90 L.Ed. 916; Rogers v. Missouri Pacific R. Co., 1957, 352 U.S. 500, 504, 77 S. Ct. 443, 1 L.Ed.2d 493. Professor Moore. says a verdict may be directed only· "where both the facts and the inferences to be drawn therefrom, as supported by the overwhelming weight of the evidence,. point so strongly in favor of one party· or the other that the court feels reasonable men could not possibly come to a. contrary conclusion." 5 Federal Practice (2d ed. 1951), 2314. See also 9. Wigmore, Evidence (3d ed.) § 2494, especially the formulations by Lord Justice Brett and Lord Wright at p. 299 and n. 17, and the two opinions in Galloway v. United States, 1943, 319 U.S. 372,. 63 S.Ct. 1077, 87 L.Ed. 1458.

guaranteed" in section 7, 29 U.S.C.A. § 157, "dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it," or "refuse to bargain collectively with the representatives of his employees," Sections 8(a) (1), (2) and (5), 29 U.S.C.A. § 158(a) (1), (2) and (5), even though the new bargaining representative was freely joined by a majority of its employees. This was the principal unfair labor practice found; we shall discuss the others in dealing with the remedy.

At first sight it seems, indeed, a far cry from the objectives of the Act that we should hold it an unfair labor practice for an employer to join an uncoerced majority of its employees in action they both want, when the only injured persons are the minority and an organization whose position depends on a suffrage it no longer possesses. However, surface impressions are rarely reliable in this complicated field; and the Board's position, more fully explicated in Hexton Furniture Co., 111 N.L.R.B. 342 (1955), cf. Shamrock Dairy, Inc., 119 N.L.R.B. 998, 1002 (1957), draws substantial support, in reason as well as in authority, from Brooks v. N. L. R. B., 1954, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125, affirming the enforcement of an order, 98 N.L.R.B. 976, finding it an unfair labor practice for an employer to refuse to bargain with a union which had won an election but had been disclaimed by a majority a week thereafter and a day prior to certification. Fundamental to the decision was a view, 348 U.S. at pages 99–100, 75 S.Ct. at pages 178–179, that the choice of a bargaining representative by an election was not to be lightly set aside; the Court said, 348 U.S. at page 103, 75 S.Ct. at page 181, that "The underlying purpose of this statute is industrial peace" and that "To allow employers to rely on employees' rights in refusing to bargain with the formally designated union is not conducive to that end, it is inimical to it."

The Board says the principles stated in Brooks apply not only during a period when the holding of a new election is prevented by statute, § 9(c) (3), 29 U.S.C.A. § 159(c) (3), as in that case, but also when it is precluded by the Board's "contract-bar" rule. The Fifth Circuit seems to have so held in N. L. R. B. v. Sanson Hosiery Mills, Inc., 1952, 195 F. 2d 350, although its decision may have been influenced by a belief that § 9 made it mandatory for the Board to hold an election upon the filing of a petition by 30% or more of the employees in any bargaining unit if no valid election had been held within a year, despite a longer "contract-bar,"—a view to which we should find it hard to subscribe in the light of the legislative history of approval of the contract-bar rule to which we adverted in Local 1545, United Brotherhood of Carpenters and Joiners v. Vincent, 286 F.2d 127, n. 4. Taking that self-same history into account, we think the Board's ruling falls within the rationale of Brooks v. N. L. R. B., supra. As the Board said in Hexton Furniture Co., supra, 111 N.L.R.B. at page 344, "Otherwise, we should have the anomalous result of an employer being permitted unilaterally to redetermine his employees' bargaining representative at a time when the Board would refuse to make such redetermination because the time is inappropriate for such action." However, it does not follow, as the Board appears to believe, that unfair labor practices are fungible and that it was thus appropriate to impose the same remedies here as for more aggravated breaches of the law.

**V.** *The Remedies.*

We shall deal first with paragraph 2c of the order, which requires respondent to restore "the system of overtime pay existing prior to May 30, 1958, and make such employees whole for any loss of earnings they may have suffered by reason of the elimination of such overtime pay." Harsh as it may seem to require respondent to pay the drivers sums they voluntarily forewent, we may not ignore that, from the Board's standpoint, this was the very nub of

respondent's breach of industrial peace, and that hence respondent cannot be permitted to retain the fruits, Cascade Employers' Association, Inc., 126 N.L.R.B. No. 118 (1960); Smith's Van & Transport Company, Inc., 126 N.L.R.B. No. 129 (1960). The Board might well have limited the reimbursement to July 31, 1960, when the contract would have expired. However, we cannot say it was required to do that, for the contract provided that, if not renewed on or before the expiration date, "the terms and conditions thereof shall continue in full force and effect." Still there must be some terminus; we shall establish one below.

We come next to the provisions of the order requiring respondent to cease and desist from recognizing Local 602 "unless and until such labor organization shall have been certified by the Board as the representative of the said employees" and to recognize Local 770 in the meanwhile. In N. L. R. B. v. Adhesive Products Corp., 2 Cir., 1960, 281 F.2d 89, this Court conditioned enforcement of a similarly worded order upon the Board's ascertaining the choice of the majority by a new election. I regretfully dissented in that case, believing that imposition of such a condition where the Board had found coercion in the literal sense, sensible as it was on the facts, was precluded by decisions of the Supreme Court and one of our own. Whether that was right or wrong, I do not think the cited decisions prescribe so iron-clad a rule as to prevent our imposing such a condition here. In International Ass'n of Machinists v. N. L. R. B., 1940, 311 U.S. 72, 61 S.Ct. 83, 85 L. Ed. 50, there had been a long history of management favoritism to the established and hostility to the aspiring union; and in Franks Bros. Co. v. N. L. R. B., 1944, 321 U.S. 702, 703, 64 S.Ct. 817, 818, 88 L.Ed. 1020, the employer had "conducted an aggressive campaign against the Union, even to the extent of threatening to close its factory if the union won the election." The Court's statements as to the discretion that must be allowed the Board to determine when the effects of the forbidden conduct had been eradicated must be read against that background.[9] In N. L. R. B. v. Stow Manufacturing Co., 2 Cir., 1954, 217 F. 2d 900, 905, certiorari denied 1955, 348 U.S. 964, 75 S.Ct. 524, 99 L.Ed. 751, there were findings "that, not only were the respondent's practices 'calculated to * * * exert a telling effect to turning the men against the Union,' but that they 'did' so." None of this is present here. Respondent had recognized and dealt with Local 770; the head and front of its offending is that it recognized and dealt with Local 602, the free choice of a majority of its employees, during a period when Local 770 was entitled to contract-bar protection. Although we affirm the Board's holding of an unfair labor practice, this was surely at the periphery and not the center of § 8(a); the interest being vindicated here is not so much the direct interest of the employees in freely choosing their bargaining representatives as the broader interest in industrial peace. We fail to see how that would be promoted by forcing respondent to recognize a union whose claim to contract-bar protection expired more than eighteen months ago, which ceased to represent the employees over a year before that, and which may not be their choice today, when an election can so easily tell. To be sure, there must be something that will make it unattractive for employers to violate the contract-bar, but that can be and is done by a sanction looking toward the past—the reimbursement of lost overtime pay and the restoration of other wage and hour provisions of the earlier contract—rather than one which may well create further trouble in the future and thereby impair rather than promote industrial peace. Although

9. The other Supreme Court case cited, N. L. R. B. v. Warren Co., 1955, 350 U.S. 107, 76 S.Ct. 185, 100 L.Ed. 96 is— and was not in point, since it was a contempt proceeding, not a petition for enforcement or review.

it has repeatedly affirmed the Board's wide discretion as to remedies, the Supreme Court has also made plain that "This is not to say that the Board may apply a remedy it has worked out on the basis of its experience, without regard to circumstances which may make its application to a particular situation oppressive and therefore not calculated to effectuate a policy of the Act." N. L. R. B. v. Seven-Up Bottling Co., 1953, 344 U.S. 344, 349, 73 S.Ct. 287, 290, 97 L.Ed. 377. The proper course here is to reinstate the 1957 contract insofar as it relates to wages and working conditions, as the Board did, but to suspend union security provisions and the selection of a bargaining representative until the employees have had a chance to make this choice for themselves in a Board conducted election. Accordingly we shall condition enforcement of paragraph 2b upon the Board's holding an election within 60 days after our order becomes final and shall modify paragraph 2c to terminate upon the Board's certification of the results.

Paragraph 2d requires respondent to reimburse to its employees "the dues, fees and assessments which these employees have paid to Local 602 as a condition of employment during the period commencing May 30, 1958." This is the so-called Brown-Olds remedy, which has not won much judicial favor, thus far.[10] Counsel urge the case to be like N. L. R. B. v. Revere Metal Art Co., Inc., 2 Cir., 1960, 280 F.2d 96, that and N. L. R. B. v. Local 294, I.B.T., 2 Cir., 1960, 279 F.2d 83, being the only decisions in which this court has enforced general imposition of the Brown-Olds remedy. In fact, the cases are at opposite poles. In Revere we found that non-unionized employees had been subjected to "coercion in the most literal sense"; 280 F.2d at page 100. Here the employees had long been union members; they simply, and voluntarily, transferred from one local to another which they preferred. We shall limit paragraph 2d to those employees who continued to pay dues to Local 770 and for the period of such payment, not, however, later than the date when our order becomes final. See Local 357, I. B. of T., etc. v. N. L. R. B., 1960, 107 U.S.App.D.C. 188, 275 F.2d 646; Morrison-Knudsen Co. v. N. L. R. B., 9 Cir., 1960, 276 F.2d 63; N. L. R. B. v. Halben Chemical Co., 2 Cir., 1960, 279 F.2d 189.

The Board seems to have been right in finding the union security clause of the agreement with Local 602 unlawful in a number of respects; however, it is unnecessary to consider this in view of our sustaining the holding that the very making of the agreement was an unfair labor practice. It is similarly unnecessary to consider whether the evidence supported the finding that respondent unlawfully turned over control of its seniority practices to Local 602, in violation of the rule in Pacific Intermountain Express Co., 107 N.L.R.B. 837 (1954), enforced N. L.. R. B. v. International Bhd. of Teamsters, 8 Cir., 1955, 225 F.2d 343, and North East Texas Motor Lines, 109 N.L.R.B. 1147 (1954), enforced N. L. R. B. v. Dallas General Drivers etc., Union 745, 5 Cir., 1956, 228 F.2d 702. For the only basis for respondent's depriving Bedford of his seniority was his failure to become a member of Local 602, as required by the union security clause of the agreement with that Local. Since that agreement falls, paragraph 2e, relating to Bedford's seniority status, is clearly proper; we construe this as relating only to such period as Bedford remained in respondent's employ, unless his severance was for a forbidden cause.

The Board's order will be enforced with the modifications indicated. We suggest the parties endeavor to agree on a decree; if not, that should be settled on notice.

10. Most of the cases are collected in N. L. R. B. v. United States Steel Corp. (American Bridge Division), 3 Cir., 1960, 278 F.2d 896, petition for certiorari pending.