Edward VANASCO, Petitioner,

v.

SECURITIES AND EXCHANGE COM-
MISSION, Respondent.

No. 214, Docket 31617.

United States Court of Appeals
Second Circuit.

Argued Nov. 15, 1967.

Decided May 31, 1968.

Harvey J. Klaris, Feiner & Klaris, New York City, for petitioner.

Walter P. North, Assoc. Gen. Counsel, Philip A. Loomis, Jr., Gen. Counsel, Meyer Eisenberg, Asst. Gen. Counsel, Theodore S. Kaplan, Atty., Securities and Exchange Commission, for respondent.

Before WATERMAN, FRIENDLY and SMITH, Circuit Judges.

WATERMAN, Circuit Judge:

Petitioner has asked us to review, pursuant to Section 25(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78y (a), an order of the Securities and Exchange Commission (SEC) barring him from association with any broker or dealer. This severe penalty was imposed upon petitioner by the Commission after the Commission found that petitioner had wilfully violated, or had aided and abetted the wilful violation of, the anti-fraud provisions of the federal securities laws [1] in the offer and sale of the common stock of Puritan Chemical Corporation (Puritan). Because we believe there was substantial evidence in the record as a whole to support the Commission's findings that petitioner had wilfully violated or had aided and abetted the wilful violation of federal securities laws, and because the penalty imposed, though harsh, was one which the Commission had statutory power to impose, we affirm the decision and order of the Commission.

In December 1960, petitioner, then 18 years old and a recent high school graduate, became a trainee-cashier at J. P. Howell & Co., Inc. (Howell), a registered broker-dealer firm owned by his uncle, Michael LaMarca. Shortly thereafter petitioner passed the NASD examination and became qualified to sell securities to the public. On June 1, 1961, Howell became a co-underwriter of Puritan's common stock offering and, from that date to July 11, 1961, when the offering was terminated, the firm sold approximately 70,100 shares of Puritan to the public at the offering price of $1.25 per share. From mid-July 1961, through July 1962, Howell continued to deal in Puritan stock, selling it at prices ranging from 1 to 1⅝ per share; Howell's total volume of sales of Puritan to the public approached $200,000.

On August 31, 1964, the Commission instituted a public administrative proceeding against J. P. Howell & Co., Inc. and its officers and salesmen for violating the anti-fraud provisions of the federal securities laws in connection with the Puritan offering and sales. Upon the evidence adduced at the hearing the Hearing Examiner concluded, and the Commission later agreed, that the salesmen at Howell were selling the Puritan stock by means of "a concerted high pressure sales campaign to defraud the investing public," and that the entire Puritan operation at Howell & Co. demonstrated a "gross indifference to the basic duty of fair dealing required of persons in the securities business." The evidence disclosed several different instances of high-pressure techniques being used by almost all the Howell salesmen. As a result of the hearing, Howell, the corporate defendant, suffered revocation of its registration as a broker and dealer, and five of the seven Howell salesmen named as respondents in the Commission's order for proceedings were barred from association with any broker or dealer.[2] Two of the five barred salesmen, Hoffman and Waldman, failed to

---

1. Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); Sections 10 (b) and 15(c) (1) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78o(c) (1), and Rules 10b-5 and 15c1-2 thereunder, 17 CFR 240.10b-5, 240.15c1-2.

2. The two salesmen not barred were named in the order for proceedings as participants in the unlawful activities but were never located or served.

file petitions for review with the Commission; therefore the Hearing Examiner's order became final as to them. The corporate defendant and three salesmen, LaMarca, Negri, and Vanasco did file petitions for review, the petitions were granted, and upon independent review the Commission affirmed the sanctions imposed by the Hearing Examiner. Of these four defendants only Vanasco has appealed to us. Moreover, on this appeal Vanasco does not contend that the pattern of activities of the Howell salesmen did not violate the anti-fraud provisions of federal securities law; he only maintains that there is no substantial evidence in the whole record to show that he participated in the "boiler-room" activities of his colleagues. Additionally, he claims that the sanction imposed upon him by the Commission is excessive, arbitrary, capricious, and an abuse of discretion, and otherwise not in accordance with law; and he also asks that at the very least we grant him leave, pursuant to Section 25(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78y(a), to adduce additional evidence.

The finding that petitioner was involved in the Puritan sales campaign was derived principally from the testimony of Peter Menoudakas. Menoudakas, who purchased 200 shares of Puritan in mid-June 1961, stated that he received a phone call from petitioner a few weeks prior to his purchase, and that during the call petitioner told him that he had a new stock selling at a dollar and a quarter, that it was a good stock, and that the stock presented an opportunity for Menoudakas to make a few dollars because its real value was three to four dollars a share. According to Menoudakas, petitioner told him nothing about Puritan's business except that the company manufactured artificial flowers and expected to obtain some big contracts for their product, and, in particular, an expected deal with A & P was mentioned. No mention was made of Puritan's tenuous financial condition. Menoudakas further testified that when he hesitated about buying, petitioner put a Mr. Greene (an-

other Howell salesman) on the telephone, and Greene told Menoudakas that he should not hesitate, that this was the time to buy, and that Greene then repeated much that petitioner had said regarding the opportunity to turn a quick profit on the Puritan stock. Menoudakas then bought 200 shares of Puritan. He testified that he never received a prospectus of the corporation.

On the other hand, Vanasco, testifying for himself, did not deny that he had sold the 200 shares to Menoudakas, but he gave a completely different version of the facts surrounding the sale. He claimed that he had met Menoudakas at a cocktail party in January or February 1961, and had informed Menoudakas that he was a securities salesman. Thereupon, according to petitioner, Menoudakas indicated that he was fairly wealthy and liked to deal in speculative stocks, especially new issues, and Menoudakas then asked petitioner whether petitioner had anything that looked good to petitioner at that time. Petitioner claimed he then mentioned to Menoudakas that Howell had an issue in registration that would come out in the spring or summer at about a dollar a share, and, upon hearing of this, Menoudakas asked petitioner to send him a confirmation for 200 shares when this stock came out. Finally, Vanasco testified that when the issue did come out he sent Menoudakas a confirmation for 200 shares without any further conversation about Puritan, none being necessary. The Hearing Examiner credited Menoudakas's testimony and refused to credit petitioner's testimony.

 The issue of the credibility to be accorded the testimony of witnesses is initially an issue for the Hearing Examiner to resolve, and then for the Commission. See Standard Distributors, Inc. v. FTC, 211 F.2d 7, 12 (2 Cir. 1954). As the Commission noted in approving the Examiner's decision here, "the Examiner heard the witnesses and was able to observe their demeanor." We should not overturn an agency's approval of its examiner's evaluation of the reliability of oral testimony "unless on its face it is

hopelessly incredible." NLRB v. Dinion Coil Co., 201 F.2d 484, 490 (2 Cir. 1952); NLRB v. Marcus Trucking Co., 286 F.2d 583, 589 (2 Cir. 1961). Here, a search of the whole record discloses that the telephone technique by which Menoudakas claimed to have been victimized is substantially similar to the techniques (including the use of a second salesman to clinch the sale) by means of which the other Howell salesmen had made their sales of Puritan. Moreover, Menoudakas's story that he was given the standard telephone pitch is far more credible than petitioner's story that he mailed out the stock solely on the basis of a conversation had four or five months earlier at a cocktail party. For these reasons we are loath to characterize the Menoudakas testimony as "hopelessly incredible," and therefore we accept the Commission's decision on credibility. Once accepting the Commission's decision on credibility, it is clear that there is "substantial evidence on the record considered as a whole," as that language was interpreted in, e. g., Universal Camera Corp. v. NLRB, 340 U.S. 474, 485, 71 S.Ct. 456, 95 L.Ed. 456 (1951) and NLRB v. Marcus Trucking Co., supra, 286 F.2d at 591–592, to support the finding that petitioner had violated the federal securities laws.

■ Petitioner's request that he be granted leave to adduce additional evidence also must be denied. Section 25(a) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78y(a), authorizes us to grant such leave if the proposed evidence is material and if there were reasonable grounds for not adducing the evidence at the hearing. The additional evidence sought to be adduced by petitioner is the testimony of his friends, Jerry Goldsmith and Thomas Heffernan, both of whom, by affidavit, have indicated that they were present at the cocktail party and heard petitioner's conversation with Menoudakas and that their testimony would substantially corroborate that of petitioner. However, in their affidavits, Goldsmith offers no excuse for not appearing at the hearing, and Heffernan states merely that he was ill at that time. Petitioner, who is now represented by different counsel from the counsel who represented him before the Hearing Examiner, offers no explanation except that of change of counsel for his failure to call these witnesses or to seek an adjournment of the hearing, or for his failure to make some other timely effort to secure their testimony.[3] It is clear from petitioner's testimony before the Examiner that he knew that Goldsmith and Heffernan had been present at the cocktail party. Under these circumstances, the fact that petitioner was represented by different counsel at the hearing is not enough, in itself, to constitute a showing "that there were reasonable grounds for failure to adduce such evidence before the Commission." 15 U.S.C. § 78y(a). Moreover, at the hearing Menoudakas testified that he had indeed met Vanasco at the cocktail party, so the cumulative testimony of Vanasco's friends as to what transpired at that party would add little to what was already in the record and certainly would not have contradicted Menoudakas's testimony regarding the telephone call.

■ Finally, petitioner maintains that it was a gross abuse of its discretion for the Commission to have imposed the maximum sanction upon him, that of permanently prohibiting him from any employment in the securities field. Yet the Securities Exchange Act quite clearly provides that if the Commission finds censure, barring, or suspension is in the public interest, the Commission may censure, *bar*, or suspend for a period not exceeding twelve months, a person from being associated with a broker or dealer if that person is found to have committed certain listed acts (including the acts in violation of the securities laws which petitioner was found to have

3. After the hearing petitioner retained his present counsel who thereupon moved the Commission to allow the additional evidence, which motion was denied.

committed). 15 U.S.C. § 78*o*(b) (7). This paragraph was added in 1964 in order to authorize the Commission to proceed directly against an individual without joining a broker or dealer. See U.S.Code Cong. & Adm.News, 88th Cong., 2d Sess., pp. 3034–3035 (1964). So the Commission has power to order its severest sanction if it finds it to be in the public interest to impose it. An adequate public interest is disclosed in the Commission's opinion here: "We do not believe that the public should be exposed to further risk of fraudulent conduct by those who have demonstrated their gross indifference to the basic duty of fair dealing required of persons in the securities business." As we said in Marketlines, Inc. v. SEC, 384 F.2d 264, 267 (2 Cir. 1967):

> Revocation is, of course, a severe sanction, but the Commission could reasonably find that in the circumstances present here it was necessary to protect the investing public. We are not free to examine the appropriateness of action taken by the Commission as if it were before us in the first instance. In charging the Commission with the enforcement of the Act "in the public interest," Congress necessarily gave it a broad discretion. Cf. Berko v. S.E.C., 316 F.2d 137 (2d Cir. 1963); 2 Loss, Securities Regulation 1323 (2d ed. 1961).

Moreover, it is of no relevancy to the seriousness of the sanction that petitioner was tied into the "boiler-room" operation by the testimony of only one witness. See, e. g., Walker v. SEC, 383 F.2d 344 (2 Cir. 1967); Ross Securities, Inc., 41 S.E.C. 509 (1963). Nor is it of any significance that lighter sanctions may have been imposed in other cases. In Dlugash v. SEC, 373 F.2d 107 (2 Cir. 1967), it was urged upon us that the Commission had meted out disproportionate sanctions within the same proceeding, and we replied that, if this be so, it is irrelevant, "because the sanctions imposed upon the petitioners were well within the Commission's discretion." Id. at 110. *A fortiori*, it is irrelevant to consider sanctions imposed in unrelated proceedings. Nevertheless, for one as young and as relatively inexperienced as Vanasco, the permanent bar imposed upon his activities seems to us to be severe. We would think that, if satisfied after a period of suspension that Vanasco could be trusted to comply with the law's requirements, the Commission might, upon an application made to it, modify this sanction. The Commission has heretofore indicated that, under certain circumstances, it could be consistent with the public interest to permit a securities salesman found guilty of misconduct to resume his proscribed occupation. See Ross Securities, Inc., supra, at 517, n. 10.

Affirmed.