NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

H. KOCH & SONS, Respondent.

No. 75–3837.

United States Court of Appeals,
Ninth Circuit.

June 5, 1978.

Rehearing and Rehearing En Banc
Denied July 27, 1978.

Anne Libbin (argued), Washington, D. C., for petitioner.

John D. O'Brien (argued), of Jones, Day, Reavis & Pogue, Cleveland, Ohio, for respondent.

Before DUNIWAY, WRIGHT and SNEED, Circuit Judges.

DUNIWAY, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its order issued against H. Koch & Sons (Koch) on October 6, 1975. In its decision, which is reported at

220 NLRB 1103, the Board found that Koch violated sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (5), by refusing to execute a written contract embodying the terms of a collective bargaining agreement which it had orally agreed to. We enforce the Board's order.

## I.

### FACTS

Until June, 1974, Koch operated a manufacturing plant in Corte Madera, in northern California, where its employees were represented by two unions under separate collective bargaining agreements. The production employees were represented by the Leather, Plastic, & Novelty Workers Union, Local 31, International Leather Goods, Plastic and Novelty Workers Union, AFL–CIO (the Leatherworkers), while the machinists were represented by Marin County Lodge 238, International Association of Machinists (the Machinists). The two agreements contained identical severance pay clauses which provided:

In the event of a permanent shut-down, the Employer shall notify the Union at least thirty (30) days prior to said close-down. The Employer shall provide severance pay to employees who are permanently laid off as a result of the plant close-down based on the formula of one (1) days' pay for each year of service.

In late 1973 or early 1974, Gulf & Western Industries, Inc., Koch's parent, began to consider relocating the Corte Madera plant in southern California. Representatives of Koch met with representatives of the two unions on January 25, 1974, and told them of Koch's decision to relocate.

On March 11, the Company posted a letter notifying its employees that the relocation would take place in early June. On the following day. Leatherworkers' business manager and secretary-treasurer Charles Bruno wrote to Albert Brinskele, President of Koch, requesting negotiations concerning the effects of the relocation upon employees represented by that Union. On March 22, Bruno met with Brinskele and Henry Kelleher, Gulf & Western's Director of Labor Relations. Bruno proposed that the Company provide employment for all Leatherworker members who wished to relocate; that the Leatherworkers' contract be made applicable at the new location; that employees be paid for unused sick leave; and that wages be paid through August 1 as a form of severance pay beyond that provided for in the contract. Kelleher rejected all of these demands.

On April 10, the Leatherworkers filed an unfair labor practice charge with the Board, alleging that the Company was not bargaining in good faith concerning the effects of the planned relocation of its employees. Kelleher telephoned Bruno in early May and told him that the Company wished to resolve the issues and have the unfair labor practice charge withdrawn. He asked what it would take to settle the matter and Bruno replied that the members were primarily concerned with obtaining more generous severance benefits than those provided for in the labor agreement. Bruno proposed five days', then three days' severance pay per year of employment. Kelleher rejected these demands but stated that the Company might be willing to offer two days' wages per year of service in addition to the one day's severance pay provided for in the contract, provided that both the Leatherworkers and the Machinists agreed to the proposal. Bruno replied that while he could not speak for the Machinists, he felt certain that his own members would find the offer acceptable. Kelleher then asked Bruno to discuss the proposal with representatives of the Machinists, stating that if that union concurred the parties would have an agreement.

When Bruno telephoned Machinist spokesman Lester Young, Young told him that his union was demanding five days' severance pay per year of employment, in line with its established pattern in the area. Bruno relayed this demand to Kelleher and the two agreed that further negotiations later in the month would be necessary. A meeting was held on May 24 in San Rafael,

California, with Kelleher, Brinskele, Bruno and Young in attendance. Koch modified its proposal slightly, offering one and a half days' severance pay per year of service in addition to the one day provided for in the labor contracts. Bruno expressed satisfaction with this offer and Young, who was not authorized to accept anything less than five days' severance pay on behalf of the Machinists, agreed to discuss the proposal with his superiors.

Although no final agreement had been reached, Kelleher drafted two longhand contracts, one for each union, providing for the termination of the existing labor agreements and for the withdrawal of the Leatherworkers' unfair labor practice charge. Kelleher told Bruno and Young that he would have the agreements typed up, inserting the amounts of severance pay due the employees under the Company's proposal, and would forward the documents to the two unions for their consideration.

Kelleher and Bruno next conferred by telephone on May 30. During this conversation Kelleher proposed a new method for computing severance pay. Under the "unit plan" which he had devised, employees would receive a flat $70 per year of service with the Company. Bruno expressed approval and told Kelleher to send him the agreement for his signature. Kelleher asked Bruno to discuss the proposal with the Machinists and Bruno agreed to contact Young. On the same day, Kelleher sent Bruno a typed copy of the May 24 agreement along with a letter explaining the unit plan proposal in detail.

On May 31, the Board's Regional Director sent a letter to the Leatherworkers, with copies to the parties involved, stating that investigation had disclosed no failure to bargain on the part of the Company and declining to issue a complaint based on the union's allegations.

On June 5, Kelleher called Bruno from Anaheim, California, and asked whether Bruno had received his letter of May 30. Bruno replied that he had and expressed satisfaction with the agreement. Kelleher asked about the Machinists' position and Bruno responded, "They're not exactly happy with it but Les Young told me: Yes, we'll finally go along with it too, if that settles the matter." Kelleher responded, "Swell," and told Bruno that when he returned to New York he would retype the agreements, inserting the amounts of severance pay due the employees under the unit plan, and send the documents to the unions for signature.[1]

When Bruno did not received the promised typewritten copy of the agreement he telephoned Kelleher on June 10 to inquire about the delay. Kelleher, noticeably upset, told Bruno, "There's not going to be an agreement. You didn't negotiate in good faith with me." Kelleher said that upon his return to New York, he had discovered that the Leatherworkers' unfair labor practice charge had been dropped. He reproached Bruno for having withheld this information during the June 5 telephone conversation and angrily reiterated, "You didn't negotiate in good faith. We are withdrawing that proposal and you can go ahead and file all the charges you want in the National Labor Relations Board or in the courts. We are not doing anything more about it." Kelleher said nothing about the Machinists and made no claim that that union had not accepted Koch's severance pay offer. His only stated reason for his refusal to execute a final written agreement was Bruno's failure to tell him about the Regional Director's action.

## II.

## THE BOARD'S DECISION AND ORDER

On the foregoing facts the Board found that the parties entered into a valid oral

1. According to Kelleher's account of this conversation Bruno accepted Koch's offer on behalf of his Union but stated that he had not yet contacted Young to ascertain the Machinists' position. The Administrative Law Judge, whose findings of fact the Board affirmed on appeal, disbelieved Kelleher, expressly stating that "Bruno's version of his telephone conversation with Kelleher is credited."

agreement on June 5, 1974, and that Koch thereafter violated sections 8(a)(1) and (5) of the Act by repudiating the agreement and refusing to execute a written contract embodying its terms. The Board's order requires the Company to cease and desist from the unfair labor practices found and from like or repeated violations of the Act. It requires Koch to execute the agreement entered into on June 5 and to comply with its terms, paying employees the severance benefits due them under the agreement along with interest computed at the rate of 6% per annum from June 5 until the date of payment.

## III.

## DISCUSSION

The issue presented is a narrow one. Did the parties enter into a valid agreement concerning severance pay? If they did, the Company plainly violated section 8(a)(5) of the Act by repudiating the agreement and by refusing to execute a written contract embodying its terms. *H. J. Heinz Co. v. NLRB*, 1941, 311 U.S. 514, 525–26, 61 S.Ct. 320, 85 L.Ed. 309. Section 8(d) of the Act, 29 U.S.C. § 158(d), expressly states that "to bargain collectively is . . . the execution of a written contract incorporating any agreement reached if requested by either party . . . ."

■ Whether or not the parties entered into an agreement is essentially a question of fact, *NLRB v. Marcus Trucking Co.*, 2 Cir., 1961, 286 F.2d 583, 590–91, and we may not disturb the Board's finding on the issue if it is supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e). *See also, Universal Camera Corp. v. NLRB*, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. There is little merit in Koch's assertion that it is not.

Bruno and Kelleher both testified that during their telephone conversation of May 30, Kelleher outlined the unit plan for computing severance pay which he had devised. Both testified that pursuant to that plan, Kelleher, on behalf of the Company, offered to pay the employees a flat $70 per year of service, provided that both the Leatherworkers and Machinists agreed to the proposal. Bruno testified that when he spoke to Kelleher by telephone on June 5, he accepted the Company's offer on behalf of the Leatherworkers. He also testified that when Kelleher inquired about the Machinists' position he, Bruno, conveyed Young's acceptance on behalf of the Machinists to Kelleher, who said "Swell," and that he would send contracts for signature.

■ Bruno's testimony, which the Administrative Law Judge and the Board expressly credited, supports the Board's conclusion that an agreement was reached on June 5. Applying fundamental contract principles of offer and acceptance to the facts, as presented by Bruno, the parties entered into an oral contract when, on that date, they expressed mutual assent to the unit formula proposed by Kelleher.

Koch disputes the Board's finding that the Machinists accepted its offer. It says that the only record evidence which supports this finding is Bruno's testimony concerning Young's words; that Bruno's testimony as to what Young said was hearsay; that the testimony was not corroborated by any other evidence; and that uncorroborated hearsay is not substantial evidence on the record as a whole within the meaning of 29 U.S.C. § 160(e).

■ Bruno's testimony as to what Young said would be hearsay if introduced to prove the truth of what Young said. F.R.E. 801(c). It was not offered or received for that purpose, but only to show that Young uttered words of assent, regardless of their "truth." That is not hearsay at all, but is rather evidence of verbal conduct.

> Manifestly, proof of utterances and writings may be made with an almost infinite variety of . . . purposes, not resting for their value upon the veracity of the out-of-court declarant and hence falling outside the hearsay classification. . . . [P]roof of oral utterances by the parties in a contract suit constituting the offer and acceptance which brought

the contract into being, are not evidence of assertions offered testimonially but rather of utterances—verbal conduct—to which the law attaches duties and liabilities. McCormick on Evidence, § 249, 2 Ed. p. 588.

See also, United States v. Calaway, 9 Cir., 1975, 524 F.2d 609, 613; Creaghe v. Iowa Home Mutual Casualty Company, 10 Cir., 1963, 323 F.2d 981, 984–85.

The truth of Young's words was completely irrelevant, for "[t]o lead a person reasonably to suppose that you assent to an oral agreement is to assent to it," contrary intentions notwithstanding. O'Donnell v. Clinton, 1888, 145 Mass. 461, 463, 14 N.E. 747, 751 (Holmes J.). Bruno's testimony concerning Young's words was thus relevant solely for the nonhearsay purpose of establishing the fact of utterance. The Board properly considered the testimony as proof that Young accepted Koch's severance pay offer by uttering words of assent, regardless of the Machinists' actual intentions. Inasmuch as the testimony was not hearsay for this purpose, it was sufficient, even without corroboration, to support the Board's finding that the Machinists accepted Koch's offer.

The testimony was not uncorroborated. It was supported by statements that Kelleher himself made when Bruno telephoned him in New York on June 10. Kelleher did not, on that date, assert that the agreement was off because the Machinists had not yet accepted Koch's offer or because Koch was dissatisfied with the indirect method of acceptance which had been employed. Instead he stated that he was outraged by Bruno's failure to tell him of the Regional Director's decision not to issue a complaint and that he was withdrawing Koch's offer because of Bruno's asserted failure to negotiate in good faith.

The fact that Kelleher voiced no doubts concerning the Machinists' position on June 10 strongly suggests that he harbored no such doubts but was rather satisfied that that union had accepted Koch's offer as Bruno said that it had. The fact that Kelleher expressed no dissatisfaction with the indirect manner in which the Machinists' assent had been communicated suggests that direct notification of acceptance was not required. The present assertions that it was required smack of post hoc rationalization. Substantial evidence on the record as a whole supports the Board's conclusion that Kelleher repudiated the agreement, not because he had received no direct notification of the Machinists' acceptance, but because he believed, on the basis of the Regional Director's action, that Koch was "no longer under any obligation to bargain, and that the agreement could be abrogated under the subterfuge that Bruno's failure to inform Kelleher on June 5 that the charge had been dismissed somehow warranted cancellation of negotiations." 220 NLRB at 1103.

Koch says that the Board's conclusion that the Machinists accepted its offer was implicitly based on a finding "that Bruno was the Company's agent for purposes of negotiating with" the Machinists. This issue of agency was not raised in the General Counsel's complaint or litigated before the Administrative Law Judge, and Koch maintains that the Board's finding that an agency relationship existed deprived it of due process of law. This is nonsense. The Board made no finding, express or implied, that Bruno was authorized to act as an agent for the Company or the Machinists, nor was it necessary for it to do so in order to conclude that the parties entered into a valid agreement. It is clear from the record that Bruno acted throughout the negotiations as a messenger, not a negotiating agent, sounding out Young on Kelleher's various proposals and relaying his responses back to Kelleher pursuant to Kelleher's repeated requests. While Bruno was not, according to his own testimony, authorized to accept any offers for the Machinists, he could and did convey the Machinists' acceptance of Koch's severance pay offer to Kelleher. Kelleher's express reliance on Bruno to convey Young's response made notice from Bruno of the Machinists' acceptance effective and binding on Koch.

The order of the Board will be enforced.

SNEED, Circuit Judge (dissenting):

I dissent. The National Labor Relations Act does not abrogate the law of agency or the law of offer and acceptance. However Bruno's role is denominated, he may not be treated like the post office, *see Adams v. Lindsell*, 1 B. & Ald. 681 (1818). His statements had operative significance only if Bruno was Kelleher's agent to ascertain whether Young would accept Kelleher's offer and Young's agent for the transmission of his acceptance. The burden is upon the party asserting agency both to prove its existence and its extent. *Sunset Line & Twine Co.*, 79 N.L.R.B. 1487 (1948). The two telephone conversations between Kelleher and Bruno (R.T. 28–29, 29–30) at best show authority in Bruno to convey information to Kelleher; but as soon as the need for negotiations arose, Young was called to attend a meeting personally (R.T. 30–33). I find sufficient evidence neither of Bruno's actual authority to act as the agent of both Kelleher and Young, nor of his apparent authority to do so, *see* 29 U.S.C. §§ 152(13), 185(e).

Even assuming such authority, it is unclear whether the parties intended to be bound by their oral agreement or rather intended to be bound only when the contract was fully executed and delivered. The Board and the majority assume the former, but this is a factual question for which they muster no support. 1 *Corbin on Contracts* § 30 (1963); *Warrior Constructors v. International Union of Engineers, Local 926*, 383 F.2d 700, 708 (5th Cir. 1967). The duty upon a party engaged in collective bargaining to execute a written agreement, 29 U.S.C. § 158(d), arises only when the parties have already chosen to bind themselves orally; this provision does not *ex proprio vigore* create an agreement for the parties. *Genesco, Inc. v. Joint Council 13, United Shoe Workers*, 341 F.2d 482 (2d Cir. 1964). Kelleher's reported statement in the June 10 conversation with Bruno, referred to by the majority, that he was "withdrawing that proposal" (R.T. 38) is consistent with the position that no agreement had been reached. I would remand to the Board for factual findings on both these issues.